UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | | * | CRIMINAL NO. 12-CR-00146 |
| | | * | |
| VERSUS | | * | JUDGE FOOTE |
| | | * | |
| ALEXANDER DERRICK REESE | (01) | * | MAGISTRATE JUDGE HANNA |
| DREW T. GREEN | (02) | * | |
| THOMAS WILLIAM MALONE, JR. | (03) | * | |
| BOYD ANTHONY BARROW | (04) | * | |
| JOSHUA ESPINOZA | (05) | * | |
| CURIOUS GOODS L.L.C. | (06) | * | |
| RICHARD JOSEPH BUSWELL | (07) | * | |
| DANIEL JAMES STANFORD | (08) | * | |
| DANIEL PAUL FRANCIS | (09) | * | |
| BARRY L. DOMINGUE | (10) | * | |

**GOVERNMENT'S CONSOLIDATED RESPONSE, IN OPPOSITION,
TO DEFENDANT REESE'S MOTION TO SUPPRESS EVIDENCE (RECORD
DOC. 288), DEFENDANT REESE'S MOTION TO SUPPRESS EVIDENCE
AND REQUEST FOR A HEARING PURSUANT TO *FRANKS v. DELAWARE*
(RECORD DOC. 321), MOTION TO ADOPT MOTION OF OTHER
DEFENDANT (RECORD DOC. 352), AND MOTION TO ADOPT MOTION OF
OTHER DEFENDANT (RECORD DOC. 363)**

**COME NOW**, the **UNITED STATES** of **AMERICA**, by and through the United

States Attorney for the Western District of Louisiana and the undersigned Assistant

United States Attorney for the Western District of Louisiana, and respond, in

opposition to Record Documents 288, 321, 352 and 363 for the following reasons.

1

# I.
## Introduction

Defendant Reece has filed two expansive (2) motions (Record Docs. 288 and 321) in the hope of excluding pertinent evidence seized relative to six (6) search and seizure warrants executed on July 25, 2012, in Gainesville Florida.  The warrants (hereinafter referred to as the "Gainesville warrants") were for locations at two (2) business premises and three (3) safe deposit boxes.[1] *See* Government Exhibits 1 - 6.  In his motions, Defendant Reece claims that the search warrants obtained by the government were pursuant to an overbroad warrant and general search (Record Doc. 288), and that the affidavit lacked probable cause (Record Doc. 321).[2]  Defendant Stanford and Defendant Domingue filed two (2) separate Motions to Adopt (Record Docs. 352 and 363), seeking to adopt Defendant Reece's Motion to Suppress (Record Doc. 321).  Under the circumstances, this Honorable Court should summarily deny Defendant Reece's

---

[1] The specific locations detailed in the warrants and applications were: 1) the business premises, curtilage thereof, outbuildings or conveyances located at 6921 NW 22nd Street, Gainesville, Alachua County, Florida, 32653, more particularly described in Attachment A; 2)the business premises, curtilage thereof, outbuildings or conveyances located at 6911 NW 22nd Street, Suite I, Gainesville, Alachua County, Florida, 32653, more particularly described in Attachment A; 3) the business premises, curtilage thereof, outbuildings or conveyances located at 6911 NW 22nd Street, Suite J, Gainesville, Alachua County, Florida, 32653, more particularly described in Attachment A; 4) the contents of safe deposit box number 1145 in the name of Alexander Reece, located at Bank of America, 2627 NW 43rd Street, Gainesville, Alachua County, Florida, 32606; 5) the contents of safe deposit box number 150130 in the name of Alexander Reece, located at Gateway Bank of Central Florida, 4100 Northwest 37th Place, Gainesville, Alachua County, Florida 32606; and 6) the contents of safe deposit box number 150132 in the name of Alexander Reece, located at Gateway Bank of Central Florida, 4100 Northwest 37th Place, Gainesville, Alachua County, Florida 32606.

[2] Record Doc. 321 also requests a hearing pursuant to *Franks v. Delaware*, alleging that the affiant's "knowing and intentional false statements," "material omissions" and "reckless disregard for the truth," strip the affidavit of probable cause, thereby warranting the judiciary to invoke the exclusionary rule, subsequently barring the admission of any evidence related to the search warrants at the trial of the defendant.

motions to suppress and Defendants Stanford's and Domingue's motions to adopt.  As discussed in detail below, law enforcement acted in good faith at all times in obtaining and executing the search warrants.  All warrants in this case were valid, supported by sufficient probable cause[3], and approved by a neutral, detached magistrate.  Finally, Defendant Reece has not established a reasonable expectation of privacy in the business premises, and Defendants Stanford and Domingue completely lack any basis to establish a reasonable expectation of privacy in any of the search and seizure warrants executed in Gainesville, Florida.

## II.
## Standard of Review for Suppression Motions

If evidence was seized pursuant to a search warrant, then the defendant bears the burden of proving that the evidence in question was seized in violation of his Fourth Amendment rights.  *See United States v. De La Fuente*, 548 F.2d 528, 533-34 (5th Cir. 1977).  Evidentiary hearings on motions to suppress are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief.  *United States v. Dean*, 100 F.3d 19, 21 (5th Cir. 1996); *United States v. Harrelson*, 705 F.2d 733, 737-38 (5th Cir. 1983).  Factual allegations set forth in a defendant's motion must be sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. *Id.*  General or conclusionary assertions, founded upon mere suspicion or conjecture,

---

[3]  *See* Government Exhibit 7 (Affidavit for the Gainesville warrants) (hereinafter referred to as Search Warr. App.)

will not suffice.  *Id.*  The determination of whether a hearing is required on a motion to suppress is necessarily dependent upon the particular facts which attend a particular request, and the district court is properly left with a certain amount of discretion in this regard.  *Id.*

## III.
## "Standing"

It is well settled that a defendant's right to challenge a search no longer depends on traditional concepts of standing, but "whether governmental officials violated any legitimate expectation of privacy held (by the defendant)." *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980).  In other words, a defendant's right to challenge a search hinges on whether the Fourth Amendment rights of the defendant have, in fact, been violated.  *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).  Under a Fourth Amendment analysis, it is clear that Defendant Stanford and Defendant Domingue had no legitimate expectation of privacy in the execution of the search warrants located at Defendant Reece's corporate/company offices and his safe deposit boxes in Gainesville, Florida.[4] Attempts to vicariously assert violations of the Fourth Amendment rights of others have been repeatedly rejected. *See, e. g.*, *Salvucci*, 448 U.S. at 86; *Rakas* 439 U.S. at 134;

---

[4] "Fourth Amendment rights are personal rights, which like some other constitutional rights, may not be vicariously asserted.  A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.  And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections."  *Rakas* 439 U.S. at 133-34.

*Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969)
It is well established that it is immaterial if evidence sought to be introduced was first
obtained in violation of someone's Fourth Amendment rights. *United States v.
Valdez Hocker*, 333 F.3d 1206 (10th Cir. 2003). Since Defendants Stanford and
Domingue cannot make any showing that the searches and seizures at issue in
Defendant Reece's motions violated their personal Fourth Amendment rights to a
legitimate expectation of privacy, they may not challenge the reasonableness of these
searches and seizures, nor may they seek to invoke the exclusionary rule. *See United
States v. Padilla*, 508 U.S. 77, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993).

The government does not contest that Defendant Reece has "standing," *i.e.* a
reasonable expectation of privacy in the contents of the three (3) safe deposit boxes,
thereby affording him the opportunity to challenge said warrants. However, the issue
of whether Defendant Reece has a legitimate expectation of privacy in *all* of the
materials seized at the business premises located at 6911 NW 22nd Street and 6921
NW 22nd Street requires additional analysis. "An expectation of privacy in a
commercial premises . . . is different from, and indeed less than, a similar expectation
in an individual's home." *New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636, 96
L.Ed.2d 601 (1987). A defendant must also establish a legitimate expectation of
privacy in the particular area searched in order  to seek the suppression of evidence
that is alleged to have been unlawfully obtained. As mentioned in Agent Note's
affidavit, at the time of the application for the search warrants, Defendant Reece was,

or had been, either a managing member, and/or a registered agent of several corporations operating or having previously been operating out of 6911 and 6921 NW 22nd Street.[5]  This status alone, however, does not confer "standing" to suppress the evidence acquired during the execution of a search warrant.

For example, in *United States v. Judd*, 687 F.Supp. 1052 (N.D. Miss. 1988), Judge Davidson held that two (2) corporate officer defendants seeking to suppress business records and documents of the corporation, Kilgore Mining Co., Inc., seized during the search of Kilgore Mining's bookkeeping office lacked standing to contest the search.  Judge Davidson's extensive analysis of whether the two corporate officers had standing was thorough and well thought.

> Defendants Judd and Puett are attempting to challenge the search of Kilgore Mining's bookkeeping office and the seizure of corporate records. In order to have standing, the defendants must establish an individual privacy of property interest in the premises searched and thereby have a reasonable expectation of privacy.  The defendants bear the burden of establishing the privacy interest.  Unless the shareholder, officer or employee can demonstrate a legitimate and reasonable expectation of privacy in the records seized, he lacks standing to challenge the search and seizure.  Neither Judd nor Puett have demonstrated that they had personal items taken.  The only documents seized were corporate bookkeeping and accounting records.  As in *Williams*, the defendants had no reasonable expectation of privacy in corporate records maintained in a common file room [bookkeeping office].

*Id.* at 1055 (internal citations and quotations omitted).

Quoting *Vicknair*, Judge Davidson mentioned in his opinion that, "[w]hen

---

[5] Mountain Industry, LLC; Blue Sky International Brokers, LLC; Pure Sel, LLC; Pozzolana Consulting, LLC; North Florida Management and Consulting, LLC; C&M Investments of Florida, LLC; Madison's Avenue of Gainesville, Inc.; ADR Holdings 700, LLC; JLAR Holdings, LLC; PC Holdings 1, LLC; PC Holdings 2, LLC; PC Holdings 4, LLC; PC Holdings 5, LLC; PC Holdings 6, LLC.  *See* Search Warr. App. pp. 16-17.

corporate property is seized or searched, an individual cannot assert the corporation's Fourth Amendment rights absent a showing that he had an independent privacy interest in the goods seized or the area searched." *Id.* at 1055-56, *(*quoting *United States v. Vicknair,* 610 F.2d 372, 379 (5th Cir. 1980)).   Judge Davison continued that under the jurisprudence established in *Vicknair*, *United States v. Britt*, 508 F.2d 1052, 1055 (5th Cir. 1975), and *Williams v. Kunze*, 806 F.2d 594, 597, 599 (5th Cir. 1986), "[e]ven a corporate president and sole shareholder must establish an independent privacy interest in corporate documents to establish standing." *Judd*, 687 F.Supp. at 1056.  Judge Davidson opined that, "in *Britt*, the defendant was the president, but not the sole shareholder, and the court found that the documents seized were normal corporate records which were not prepared by the defendant, that they were not maintained in his personal office, and that the search was directed at the corporate activity generally and not at one individual person."  *Id.*  Judge Davidson noted that, "Judd is in a different position as the sole shareholder of Kilgore Mining but he also fails to establish standing."  *Id.*  Judge Davidson went on to state that under the facts established in *Britt*, the Fifth Circuit applied the following accepted rule:

> When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation.  Its wrongs are not his wrongs; its immunity is not his immunity.

*Id.* (citing *Britt*, 508 F.2d at 1055).

Judge Davidson's opinion was affirmed on appeal to the Fifth Circuit.  The Court

held, in part:

> The district court, in a thorough and well-reasoned opinion, found that
> neither Judd nor Puett established standing to challenge the search.
> *United States v. Judd,* 687 F.Supp. 1052, 1061 (N.D.Miss.1988). The
> trial court also found that even if standing was established, the search
> warrant was sufficient to authorize the entire search. *Judd,* 687
> F.Supp. at 1058. Because we agree with the district court's  reasoning
> and conclusions, our treatment of these issues is brief.
>
> Standing is a privacy or property interest in the premises searched or
> the items seized which is sufficient to justify a "reasonable expectation
> of privacy" therein. *Williams v. Kunze,* 806 F.2d 594, 599 (5th Cir.1986).
> Judd and Puett have the burden of establishing their standing. *United
> States v. Antone,* 753 F.2d 1301, 1306 (5th Cir.1985), *cert. denied,* 474
> U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).
>
> The bookkeeping area at 9170 was neither Judd's nor Puett's office.
> They did not work out of that office. Judd, however, was involved in the
> preparation of some of the records seized from the 9170 office. In view
> of these facts, we find that appellants Judd and Puett, as individuals,
> have no standing to challenge the seizure of corporate records from the
> corporate bookkeeping office. *See United States v. Vicknair,* 610 F.2d
> 372, 379 (5th Cir.1980), *cert. denied,* 449 U.S. 823, 101 S.Ct. 83, 66
> L.Ed.2d 25 (1980); *United States v. Bush,* 582 F.2d 1016, 1018–19 (5th
> Cir.1978); *United States v. Judd,* 687 F.Supp. at
> 1055–56.

*United States v. Judd*, 889 F.2d 1410, 1412-13 (5th Cir. 1989).

The government does not assert that Defendant Reece lacks "standing" to assert

a challenge to the seizure of any personal property seized during the execution of the

search warrant.  However, it is clear that the vast majority of the material seized

either belonged to the corporation(s), or were records of the corporation(s) (whether in

paper or digital format), in which Defendant Reece does not maintain a reasonable

expectation of privacy.[6]  As to these materials, Defendant Reece lacks "standing" to contest the validity of the search warrants.

## IV.
## The Exclusionary Rule.

The physical evidence Defendant Reece seeks to suppress was seized pursuant to the Gainesville warrants.  The Fourth Amendment protects individuals against unreasonable searches and seizures.  Under the Fourth Amendment, "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *United States v. Powell*, 137 Fed.Appx. 701, 703-04 (5th Cir. 2005) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)); *United States v. Getachew*, 2009 U.S.Dist.LEXIS 6191, *9 (N.D.T.X. 2009), *aff'd*, 2010 U.S.App.LEXIS 2850 (5th Cir.2010).

---

[6] "An individual's status as the sole shareholder of a corporation is not always sufficient to confer upon him standing to assert the corporation's fourth amendment rights.  *United States v. Britt*, 508 F.2d 1052, 1055 (5th Cir. 1975).  Unless the shareholder can demonstrate a reasonable expectation of privacy in the records seized, he lacks standing to challenge the search and seizure. The vast majority of documents seized by the IRS were corporate records.  Appellants Williams and Hearn had no reasonable expectation of privacy in corporate records maintained in a common file room.  Therefore, they have no standing to challenge the search of the corporate premises or the seizure of the documents."  *Williams v. Kunze*, 806 F.2d 594, 599-600 (5th Cir. 1986).

9

The exclusionary rule is not a personal constitutional right of the person alleged to have been aggrieved, but rather, a judicially created remedy designed primarily to deter improper conduct by law enforcement.  *Davis v. United States*, — U.S. —, 131 S.Ct. 2419, 180 L.Ed.2d. 285 (2011); *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d. 343  (1979).  The exclusionary rule precludes the government from relying on illegally seized evidence, and its purpose is to "deter unlawful police conduct."  *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006).  This purpose will not be served, and thus the rule is inapplicable, where evidence is obtained in "objectively reasonable good-faith reliance upon a search warrant."  *Id.*  Additionally, it is not necessary to determine if there was probable cause to support the warrant if the agent's conduct clearly falls within the good-faith exception to the exclusionary rule.  *See Davis* 131 S.Ct. at 2429.

Invocation of the exclusionary rule and subsequent suppression of evidence should occur only on a case by case basis, and only in those unusual circumstances in which exclusion will further the purposes of the exclusionary rule.  *United States v. Allen*, 625 F.3d 830 (5th Cir. 2010); *United States v. Hessman*, 369 F.3d 1016 (8th Cir. 2004).  Three conditions must occur to apply the exclusionary rule: (1) police misconduct, (2) exclusion must result in appreciable deterrence of that misconduct, and (3) the benefit of the rule's application must outweigh its costs.  *United States v. Herring*, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.22 496 (2009); *see also United States*

10

*v. Koch*, 625 F.3d 470 (8th Cir. 2010).

## V.
## Application of the Good-Faith Exception
## to the Exclusionary Rule.

Notwithstanding the fact that Defendant Reece does not have a reasonable expectation of privacy, *i.e.* lacks "standing," in the vast majority of the items seized at the two corporate business premises in Gainesville, the exclusionary rule is inapplicable to *all materials* seized under the Gainesville warrants because the good-faith exception to the exclusionary rule applies.  "We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."  *Leon,* 468  U.S. at 922.

In deciding whether to deny or grant a motion to suppress, the Court should engage in a two-part inquiry: (1) whether the good-faith exception to the exclusionary rule applies, *see United States v. Leon, supra*; and (2) whether the warrant was supported by probable cause. *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992); *see also United States v. Webster*, 960 F.2d 1301, 1307 (5th Cir. 1992).  The Court, however, need not address the probable cause issue if the good-faith exception applies. *Illinois v. Gates*, 462 U.S. 213, 264, 103 S.Ct. 2317, 2346, 76 L.Ed.2d 527 (1983) (White, J., concurring); *Satterwhite*, 980 F.2d at 320 (quoting *Gates* 462 U.S. at 264).

If the good-faith exception applies, the court should stop at the first stage unless the second stage presents a novel question of law. *United States v. Stalnaker*, 571 F.3d 428, 435 (5th Cir. 2009); *see also United States v. Payne* 341 F.3d 393, 399 (5th Cir. 2003) (the court "need not reach the question of probable cause for the warrant unless it presents a 'novel question of law,' resolution of which is 'necessary to guide future action by law enforcement officers and magistrates.'") (citing *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1129-30 (5th Cir. 1997)).  This case does not present a novel question of law necessary to guide future action by law enforcement officers and magistrates.  Therefore, the only issue is to determine whether the good faith exception applies to the case.

If law enforcement officers obtain a search warrant before conducting a search, the issuance of the warrant normally satisfies the good-faith requirement. *Leon*, 468 U.S. at 922.  "Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness."  *Gates* 462 U.S. at 267 (White, J. concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon* 468 U.S. at 922 (citing *United States v. Ross*, 456 U.S. 798, n.32, 102 S.Ct. 2157, 2172 n.2, 72 L.Ed.2d. 572 (1982)).  "Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith."  *Payne*, 341 F.3d at 399 (citing *Leon*, 468 U.S. at 921-25).

12

An officer's decision to obtain a warrant is *prima facie* evidence that he or she was acting in good faith.  *See Leon*, 468 U.S. at 921 n. 21; *Gates*, 462 U.S. at 263 (White, J., concurring).  Additionally, it is common practice for federal prosecutors to work conjointly with law enforcement officers in drafting affidavits in support of a warrant application.  Such was the case here, as the  affiant's ninety-eight (98) page affidavit and attachments were thoroughly reviewed by an additional agent of Homeland Security Investigations, Task Force Agents of the North Florida HIDTA, and several Assistant United States Attorneys for the Middle District of Florida, prior to their submission to the magistrate judge.[7]  Such a thorough review in this case shows that law enforcement acted in reasonable reliance upon all warrants issued in this case when conducting their searches.  *See e.g.*, *Leon*, 468 U.S. at 904-04 n.4 (applying good faith exception where officers consulted with three deputy district attorneys before submitting deficient warrant to the court); *United States v. Johnson*, 78 F.3d 1258, 1264 (8th Cir. 1986) (noting that seeking the advice of a district attorney is a factor weighing in favor of determining that the officer's reliance on the warrant was objectively reasonable); *United States v. Brown*, 951 F.2d 999, 1005 (9th Cir. 1991) (noting "an officer's consultation with a government attorney is of significant importance to a finding of good faith.").  Furthermore, the affidavit clearly does not

---

[7] Defendant Reece asserts that that the Gainesville warrants should be suppressed, in part because of the overbroad nature of the warrants.  Obviously, the government does not concur with Defendant Reece's assertions.  However, even assuming *arguendo* that the warrant could be classified as overbroad, *i.e.*  the affidavit of probable cause does not support the breadth of the warrant, Courts have previously held that an overly broad warrant where the agents acted in good-faith drafting and executing the warrant will not be suppressed.  *United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009).

present a paucity of indicia of probable cause such that a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.  The ninety-eight (98) page affidavit to the Gainesville warrants more than established probable cause that evidence of crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, or used in committing a crime would be revealed during the execution of the warrants.  The officers acted reasonably in executing the Gainesville warrants, and nothing about this case or the warrants categorizes it as so "unusual" that the purposes of the exclusionary rule would be furthered by excluding the seized evidence; thus, Reece's motion should be denied without the need for an evidentiary hearing.

## VI.
## The Four "Exceptions" to the Good-Faith Exception are Inapplicable in this Case.

The Fifth Circuit recognizes that the good-faith exception cannot apply if one of the following four circumstances is present.  The *Leon* decision lists the four situations in which reliance on a faulty search warrant would not be objectively reasonable. *Leon* 468 U.S. at 923; *Payne*, 341 F.3d at 399-400.

> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause

as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S., at 610–611, 95 S.Ct., at 2265–2266 (Powell, J., concurring in part); *see Illinois v. Gates*, supra, 462 U.S., at 263–264, 103 S.Ct., at 2345–2346 (White, J., concurring in the judgment).  Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. *Cf. Massachusetts v. Sheppard*, 468 U.S., at 988–991, 104 S.Ct., at 3428–3430.

*Leon*, 468 U.S. at 923.

It is clear from the facts of this case, that none of the four circumstances described in *Leon* and *Payne* apply to the Gainesville warrants executed in this case. In his motion to dismiss (Record Doc. 288), Defendant Reece cites two (2) bases for his argument that the good-faith exception to the exclusionary rule is inapplicable: 1) the warrant is so facially deficient, *i.e.* it fails to particularize the place to be searched or the things to be seized such that any executing officer could not reasonably presume it to be valid, and 2) the issuing magistrate abandoned his judicial role by not signing the affidavit thereby providing no "outward indication that Judge Jones reviewed the affidavit." (Record Doc. 288-13, p. 20).  In his second motion to dismiss (Record Doc. 321), Defendant Reece argues that the search warrant affidavit contained numerous reckless and deliberate falsities and material omissions, such that probable cause is "stripped" from the affidavit once it is "purged of the falsities and supplemented by the omissions."  (Record Doc. 321-2, p. 37).  Although not supported by argument in his analysis as to why the good-faith exception does not apply (Record Doc. 288-13), nor analyzed under the good-faith exception to the exclusionary rule mentioned in his motion to suppress and request for hearing pursuant to *Franks v. Delaware* (Record

15

Doc. 321), the government will address, *infra*, the assertion that the magistrate was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth in its analysis as to why the good-faith exception to the exclusionary rule does apply.  As Defendant Reece does not allege in either of his motions to suppress (Record Docs. 288 and 321) that the warrant was based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable, the government asserts that the defendant has ceded this judicially recognized exception to the good-faith exception of the exclusionary rule, and notes its inapplicability in the present good-faith analysis.

A.     The issuing magistrate was not misled by information in the affidavit that the affiant knew was false or would have known was false except for a reckless disregard for the truth.

In Record Doc. 321, Defendant Reece identifies eight (8) categories of "knowing or intentional false statements and/or material omissions "made intentionally or with reckless disregard for the truth," which he asserts entitle him to a *Franks v. Delaware* hearing.[8]  In summary, the defendant's allegations are as follows:

> 1)     In his motion, the defendant alleges that Special Agent Note's affidavit "identifies the chief focus of the investigation as a conspiracy to import and distribute 'Synthetic Cannabinoids and Cathinones' - which he identifies without any further explanation as being 'analogues of controlled schedule I substances' - by Mr. Reece and others in violation of 21 U.S.C. §§ 963, 952, 846 and 813."  Record Doc. 321, p.2.  Reece

---

[8] Although the government contests these allegations of impropriety by the affiant to the Gainesville affidavit, if proven, the allegations might also have an effect on a judicial determination of the good-faith exception to the exclusionary rule, and as such, are discussed in this portion of the response detailing the good-faith exception.

continues, "[t]hough it broadly treats 'Synthetic Cannabinoids and Cathinones' as analogues, the Affidavit only identifies two alleged 'analogues' in its entire 98 pages: AM-2201 and UR-144." *Id.*

    2)    That Special Agent Note took the position in his affidavit that, "AM-2201 and UR-144 were established 'illegal' analogues after March 1, 2011" Record Doc. 321, p.3.; and that this position was "central to the Court's finding of probable cause."[9] *Id.*

---

[9] In Record Doc. 321-2, Defendant Reece expounds on his allegations that the position in Special Agent Note's affidavit that AM-2201 and UR-144 were controlled substance analogues after March 1, 2011, was a false misrepresentation that was central to the magistrate's finding of probable cause for the following reasons:

1. The affidavit "misrepresented as fact that AM-2201 and UR-144 are established analogues, when that is not true";

2. The affidavit "omitted the material fact that there is no consensus in the scientific community as to what constitutes a substantially similar chemical structure or pharmacological effect";

3. The affidavit, "failed to disclose that their determination that AM-2201 and UR-144 are analogues is a novel theory that has not been confirmed by any court, nor was there any prior governmental notice by the DEA that AM-2201 and UR-144 were analogues of JWH-018, the alleged controlled substance of comparison";

4. The affidavit, "manipulated the facts to make it appear as though it was an established fact that AM-2201 and UR-144 are analogues, and that every other chemical or 'synthetic cannabinoid or cathinone' referenced in the Affidavit is an analogue as well";

5. The affidavit, "did not provide the underlying facts in sufficient detail for the magistrate judge to have made his own independent assessment of whether these substances constitute analogues";

6. The affidavit, "completely omitted the fact that no human testing has been conducted on the substances at issue";

7. The affidavit, "completely ignored the inconclusive nature of the *in vitro* (test tube/Petri dish) testing done to date, which fails to prove any pharmacological effect on humans";

8. The affidavit, "completely ignored what the DEA readily acknowledges; that at the time of the warrant, DEA could only speculate as to the effect on humans of UR-144 and AM-2201 compared to JWH-018, and";

9. The affidavit, "completely ignored what the DEA readily acknowledges: that UR-144 lacks the basic chemical property that permits pi stacking at the receptor site, which, according to the foremost experts in this field, Dr. John W. Huffman (JWH) and his team, UR-144 is lacking what is essential for cannabimmetic activity." Record Doc. 321-2 pp. 19-20.

3)      That Special Agent Note, other unidentified government chemists, and others with whom Special Agent Note consulted, ". . . knowingly and recklessly misled the court when they represented as an established fact that AM-2201 and UR-144 are 'analogues,' despite knowing this contention was known to be highly disputed by experts and that there were no known prior prosecutions involving these chemicals."[10]  *Id.*

4)      That in the affidavit, Special Agent Note, experts and others he consulted, "deliberately or recklessly omit that there is no definition of other standard as to how chemical structures can be determined to be 'substantially similar' to each other."  *Id.*

5)      That the government, through Special Agent Note and his consultants, "misled the reviewing magistrate throughout the Affidavit by their material omissions regarding the complete lack of human pharmacological studies of synthetic cannabinoids."  *Id.* at p.4.

6)      That the affiant, "[d]eliberately misled the court into believing that the retail value of product to the public is the measure in determining whether the $2,000 threshold has been met."  *Id.* Defendant Reece further alleges that, [a]s Agent Note and his advisors knew, based on his and their training, the correct measure of this value is the actual price paid to the foreign manufacturer. . . there was no obligation for Formal Entry of any of these shipments as the value of each was under $2,000."  *Id.*

---

[10] The government notes that in the conclusion to Magistrate Judge Hanna's Report and Recommendations on the motion to dismiss the indictment (Record Doc. 218 and adopted by Record Docs. 218, 220, 222, and 248) he held, "[t]herefore the undersigned further finds that JWH-018 was a controlled substance on and after March 1, 2011 and that its chemical analogue AM-2201 should also be treated as such pursuant to 21 U.S.C. § 813."  Record Doc. 280, p. 21.  Additionally, in the its response (Record Doc. 471) to the defendant's motion to exclude expert opinion (Record Doc. 308) the government noted that Defendant Reece provided a transcript of the testimony of Lindsey Reinhold, a forensic chemist at the National Medical Services Lab, testifying as an expert witness for the defense in *United States v. Fedida*, Case No. 6:12-CR-209-Orl (M.D. Fla. 2012) .  Reinhold testified, in part, that she was, "comfortable saying AM-2201 [is] an analogue of JWH-018. . ." *See* Record Doc. 471-1, pp. 41, 45, 47.  When further questioned by the prosecution in the *Fedida* case, Reinhold slightly waivers, saying that AM-2201 and JWH-018 are only structurally similar, and that she could not testify as to their pharmacological effects.  *See* Rec. Doc. 471-1, p. 45.

7)      That the affidavit created a "misimpression regarding the labels on these shipments by falsely or recklessly stating that Mountain Industry LLC, Blue Sky International Brokers LLC, and/or Mr. Reece were the 'importers' of these chemicals, and thereby responsible for shipping, labels and product descriptions on packages shipped from overseas."  *Id.*  Reece asserts that the, ". . . labeling of these packages was the responsibility of the shipper or shipper's agent; responsibility for labeling did not sit with Mr. Reece or either of those companies." *Id.*

8)      That Agent Note, in order, ". . . to justify the sweeping warrants in this case, . . . falsely, or at best, with reckless disregard for the truth, represented that the multitude of businesses at the locations searched operated 'without legitimate purpose,' and that shipments of the chemical substances at issue were 'continuing through the present'."

a.  <u>The affidavit contained no knowingly false or reckless statements or omissions regarding controlled substance analogues.</u>

The government posits that Special Agent Note's affidavit did not contain any knowingly false or reckless statements or omissions to warrant application of the *Franks v. Delaware* "exception" to the good-faith exception of the exclusionary rule. From the onset, Special Agent Note identifies in his affidavit that at the time of the application he was employed as a special agent with HSI for sixteen years.[11]  Search Warr. Aff., p. 1.  His overview informed the magistrate that HSI was conducting an investigation related to the illegal importation of synthetic cannabinoids and cathinones based on false statements and invoices and smuggling goods into the

---

[11] The affidavit also includes an attestation that he previously attended the Basic Criminal Investigator School and the United States Immigration and Customs Enforcement (ICE) Academy at the Federal Law Enforcement Training Center in Brunswick, Georgia; and that he had received training from ICE in the area of customs laws, more specifically smuggling and financial investigations.  Special Agent Note includes additional information in the background section of the affidavit detailing his experience and participation in controlled substance and controlled substance analogue investigations and the financial investigations related to same.

United States.  Additionally, Special Agent Note informed the magistrate that through the course of the investigation, investigators determined that from January 1, 2011, through the time of the application, Defendant Reece was illegally importing and distributing analogues of controlled Schedule I substances.[12]

Special Agent Note reasonably relied on his training and experience, and the information provided to him by DEA and CBP chemists, that AM-2201 was an analogue of JWH-018 at the time he submitted his application for the Gainesville warrants.  Although Defendant Reece asserts that Special Agent Note "knowingly and recklessly misled the court through misrepresentations," that AM-2201 and UR-144 were established analogues of JWH-018, this assertion does not invalidate the information provided to the affiant.   These "knowing" and "reckless" misrepresentations alleged by the defendant are centered, in part, on his assertion that the term "substantially similar" as it applies to the Analogue Statute is undefined. Defendant Reece asserts that there is no accepted standard as to the term "substantially similar" adopted by the scientific community, and as such, any claim by the affiant that AM-2201 and UR-144 are controlled substance analogues is a "knowing" and "reckless" falsity.  In a similar vein, Defendant Reece also asserts that

---

[12] Effective August 15, 2010,  JWH-018 and JWH-073 were listed on Louisiana's Schedule I. *See* La. R.S. 40:964(C)(32)(c) and (d) (August 15, 2010).  Effective July 15, 2011, naphthoylindoles, the class of substances to which AM-2201 belongs, were listed on Louisiana's Schedule I.  *See* La. R.S. 40:964(F)(1).  Effective March 1, 2001, JWH-018 was a federally controlled substance because it was included on a list of five synthetic cannabinoids temporarily placed on Schedule I by the DEA on an emergency basis pursuant to 21 U.S.C. § 811(h).  *See* DEA March 1, 2011 Final Order.  Fed. Reg. 11, 075.  CP-47,497, JWH-018, AM-678, JWH-073, JWH-019, JWH-200, JWH-250, JWH-081, JWH-122, JWH-398, AM-2201, AM-694, SR-19, RCS-4, SR-18, RCS-8 and JWH-203 were added to Schedule I permanently on July 9, 2012. 21 U.S.C. §§ 812(d)(1).

Special Agent Note's failure to identify that scientists identified by the defendant claim that the term "substantially similar" is not a scientific term, thereby nullifying the analogue statute, was a knowing and/or reckless material omission.  Defendant Reece also accuses the affiant of "recklessly" or "deliberately" misleading the magistrate that the aforementioned cannabinoids have similar effects of marijuana in an effort to either bolster, or mislead the magistrate into finding probable cause.  (Record Doc. 321-2 pp.  20-27).  Defendant Reece asserts that these "facts" and others (*see* footnote 9), "failed to provide the underlying facts in sufficient detail for the magistrate judge to have made his own independent assessment of whether these substances constitute analogues."  Rec. Doc. 321-2, p. 20.

The mere assertion that the defendant disputes the fact that AM-2201 (and/or UR-144) is a controlled substance analogue, and backs his disputed assertion with an affidavit from a forensic chemist (*see* Record Doc. 321-20) that the term "susbtantially similar" in the Analogue Statute has detractors within the scientific community, that the affiant failed to include information regarding human testing/effects on humans regarding the relevant synthetic cannabinoids, or that the affiant failed to acknowledge that "UR -144 lacks the basic chemical property that permits pi stacking at the receptor site," (Record Doc. 321-2, p.20), does not mean that the affiant's statement that AM-2201 is a controlled substance analogue of JWH-018 is a "false" or "reckless" statement.[13]  *See* Exhibit 8 (chemical structure of AM-2201 and JWH-018 are

---

[13] "We have also recognized that affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation.  Technical requirements of elaborate specificity once exacted

substantially similar); Exhibits 9-10 (if intended for human consumption, UR-144 and XLR11 may be treated as a "controlled substance analogue" under the Controlled Substances Act pursuant to 21 U.S.C. §§ 802(32)(A) and 813).

b. <u>The affidavit contained no knowingly false or reckless statements or omissions regarding customs law</u>.

   The course of the investigation revealed that there was probable cause to believe that Defendant Reece was violating certain customs laws; specifically, entry of goods by means of false statements, in violation of 18 U.S.C. § 542, and smuggling goods into the United States, in violation of 18 U.S.C. § 545.[14]  To support probable cause, the

---

under common law pleading have no proper place in this area." *Gates* 103 S.Ct. at 2330-31 (internal citations and quotations omitted).  "A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." *Id.* (internal quotations and citations omitted).

   [14] 18 U.S.C. § 542 provides:
"whoever enters or introduces or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or application, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement whether or not the United States shall or may be deprived of any lawful duties; or whoever is guilty of any willful act of omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission - ..."
   18 U.S.C. § 545 provides:
"Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law –... Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section."

affidavit contains a section reciting applicable customs laws pertaining to the importation of merchandise abroad.  *See* Search Warr. Aff. pp. 8-13.  Based on Special Agent Note's training and experience, as well as his interactions with other HSI and CBP officers, the affidavit stated, "[c]ontrolled substance importers and distributors often intentionally mislabel parcels to hide the fact that the package actually contains controlled substances to avoid the substances being seized."  *Id.* at 10.  Additionally, the affiant noted that, "[s]mugglers of contraband, which could be intercepted by CBP, place orders with foreign sources and have the shipments broken up into smaller quantities.  These smaller quantities are typically sent to several different addresses in an effort to thwart CBP border inspections of inbound foreign parcels by 'shot gunning' the packages through in hopes of decreasing the odds of seizure of all of the parcels."  *Id.* at 11.  The affiant also included a reference to research he personally conducted regarding the price per kilogram of AM-2201 and UR-144.  Notably, and to the defendant's consternation, the affiant informed the magistrate in his affidavit that, "I believe REECE is in violation of 18 U.S.C. §§ 542 and 545 because every package that I and other agents and/or officers have seized contains at least one kilogram of AM-2201 or UR-144, which exceeds the $2,000 value and has been *mislabeled as to the contents*."  *Id.* at 13 (emphasis added).  Pages 21-27, and 36-39, detail seizures of packages of analogues intended for Defendant Reece.  Each of the seizures contained substances later confirmed to be AM-2201, or UR-144, and all packages were mislabeled as to their contents.

In his motion to suppress (Rec. Doc. 321), Defendant Reece attempts to assert that Special Agent Note "knowingly" and "recklessly" made false statements regarding the cost of AM-2201 or UR-144 in order to create a false impression that shipments exceeded the value of $2,000.00, and required formal entry by customs.  "Agent Note deliberately misled the magistrate judge into believing that importations of UR-144 and AM-2201 were always valued at more than $2,000; that overseas shipments of chemicals to Mountain Industry, L.L.C. or Blue Sky International Brokers, L.L.C. were always subject to formal entry; and that evidence of a violation of 18 U.S.C. §§ 542 and 545 would therefore be found in the searches."  Rec. Doc. 321-2, p.31.  This claim, however, is not what the affiant stated in his affidavit.  Special Agent Note recited to the magistrate the results of the items seized during the various seizures explained within the affidavit.  Nowhere in the affidavit does Special Agent Note claim that the importations of UR-144 and AM-2201 were *always* valued at more than $2,000; rather, the affiant explains to the magistrate the results of the specific seizures, and provides a monetary threshold of the value of the seized items because the items seized were *mislabeled*, *i.e.* purporting to be a substance other than that which was seized.  Any price value placed on the packaging of the *mislabeled* items would be irrelevant in determining what was the actual price paid.  Likewise, Defendant Reece's assertion that Special Agent Note attempted to deliberately mislead the magistrate into believing that "overseas shipments of chemicals . . . were always subject to formal entry," is also without merit.  Special Agent Note provided the magistrate with facts; facts that the packages seized by agents contained one kilogram or more of AM-2201

24

or UR-144, and that these seizures would have exceeded the value of $2,000.[15]

Defendant Reece continues to make allegations in his motion to suppress regarding the customs violations when he states that Special Agent Note, "falsely represents that the listed retail prices for these chemicals on three internet websites is the amount that should have been considered for formal entry purposes."  Record Doc. 321-2, p.31.  Defendant Reece continues to attack Special Agent Note and his "advisors," by explaining, "the 'customs value' to be considered upon entry of any merchandise in the United States is the 'transaction value' of the imported item."  *Id.* (quoting Aff. of Peter Quinter, ¶ 3).  He continues to allege that Special Agent Note misled the Court by attempting to use the ultimate retail value of the imported merchandise as opposed to the amount the buyer/importer actually paid for the imported merchandise.  *Id.*  Strikingly absent from this analysis is any information related to the fact that the items in question were *mislabeled*, *i.e.* false; it would logically follow that any price included on the mislabeled packaging would also be false.  Since the packages were mislabeled, the affiant's research into the price per kilogram of AM-2201 and UR-144, merely assists the magistrate in determining whether there was probable cause to believe violations of the customs laws occurred. Special Agent Note's analysis of prices clearly is bolstered by the corporations' own

---

[15] The government finds it striking that Defendant Reece would even attempt to make this bold assertion.  A review of the data seized from the computer utilized by Amanda Holt at the 6911 NW 22nd Street premises details the order date, order and price information, (*i.e.* 3 kilograms AM-2201 at $7,500 a kilogram) tracking and delivery address, ship date, status, etc. for orders made by Reece's corporations.  To make an argument discounting the $2,000 threshold, while knowing the actual price paid exceeded that amount seems disingenuous.  *See* Exhibit 11 (spreadsheets detailing prices paid for imported analogues).

documents, which show that the price paid per kilogram far exceeded the $2,000.00 threshold.  *See* Exhibit 11.

Finally, as it relates to the customs violations, Defendant Reece attempts to assert that Special Agent Note deliberately created the false impression to the magistrate that Reece was the importer of the products, and thereby responsible for the labeling and shipping of items passing through United States customs.  Record Doc. 321-2, p. 32.  Defendant Reece claims that since he used an express delivery service that required the shipper (*i.e.* Chinese exporters) to provide the required documentation, he is somehow insulated from criminal liability.  In other words, he makes the preposterous assumption that, notwithstanding the fact that Defendant Reece placed, or had his employees place the orders for the analogues; and not withstanding the fact that the substances (at least those that were not seized by CBP or HSI) came into his possession[16]; and notwithstanding his knowledge of the actual price and actual substances purchased; and not withstanding the fact that were the analogues properly labeled (including the actual prices paid) they would have been seized at customs; Defendant Reece can hide behind a technical argument that only the Chinese suppliers violated United States customs laws.[17]

c.  <u>The affidavit contained no knowingly false or reckless statements or omissions</u>

---

[16] "Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section."  18 U.S.C. § 545.

[17] Additionally, the government notes that this affidavit was submitted to the magistrate to merely show that there was *probable cause* to believe that the customs laws referenced had been violated.

regarding Reece's businesses not listed within the affidavit, and the information
contained in the affidavit regarding purchases of analogues was not stale.

Finally, Defendant Reece asserts that the affiant "knowingly" or "recklessly"
created the false impression that businesses associated with the premises searched had
no "legitimate purpose," and that the warrant for the premises was stale since the last
dates the analogues were shipped to the Gainesville, Florida listed in the affidavit were
ninety days old.[18] Rec. Doc. 321-2 p. 33. Magistrate Judge Jones found that there was,
in fact, probable cause to search the premises identified in the Gainesville warrants
after his review of the affidavit and attachments. *See United States v. Minis*, 666 F.2d
134 (5th Cir. 1982) (holding that information in an affidavit based on a July
conversation was not so stale it could not be considered in determining whether the
affidavit established probable cause to justify the issuance of a search warrant in
October for the defendant's rural residence and surrounding property in a marijuana
operation); *United States v. Robins*, 978 F.2d 881 (5th Cir. 1992) (holding that
approximately seven months was not too long of a time lapse between gathering
information and obtaining a search warrant, where the evidence clearly showed a long-
standing, ongoing pattern of criminal activity involving marijuana trafficking).

---

[18] "What *Hyde* and *Batisda v. Henderson*, *supra*, make very clear is that the amount of delay
which will make information stale depends on the particular facts of each case, including the nature
of the criminal activity and the type of evidence sought.  It is essential to remember that in problems
of staleness a mechanical count of days is of little assistance in the determination.  As in other issues
regarding the existence or absence of probable cause, common sense and reasonableness must
prevail, and a magistrate's judgment based upon the facts before him must be given considerable
deference in the absence of arbitrariness."  *United States v. Freeman*, 685 F.2d 942, 951-52 (5th Cir.
1982) (internal quotations and citations omitted).

Clearly, Defendant Reece's staleness argument is without merit.

Defendant Reece's argument that Special Agent Note knowingly or recklessly created the false impression that businesses associated with the site of the search have no legitimate purpose must also fail.  The affidavit in support of the warrant clearly delineates the role of the fifteen identified LLCs.  The affiant's statement that the fifteen LLCs are businesses "without a legitimate purpose" is supported by a lengthy affidavit detailing the roles Mountain Industry, LLC, Blue Sky International Brokers, LLC, and Pure Sel, LLC, played in acquiring and distributing synthetic cannabinoids, and the roles the remaining LLCs had in concealing and laundering the illicit proceeds of the synthetic cannabinoid operation.

In conclusion, there were no knowingly reckless or false statements or omissions within the affidavit to warrant the good-faith exception to the exclusionary rule inapplicable.  As such, the first step of the suppression analysis under the good-faith analysis is pretermitted.

B.    The issuing magistrate judge did not "wholly abandon" his judicial role.

On July 24, 2012, six (6) search and seizure warrants (the Gainesville warrants) were signed by Magistrate Judge Jones of the Northern District of Florida.  That same day, eighteen (18) seizure warrants for accounts located in Jacksonville, Florida, were signed by Magistrate Judge Klindt of the Middle District of Florida.[19]  Each warrant signed by Magistrate Judge Jones was accompanied by an application and attached

---

[19] Magistrate Judge Kline signed an additional seizure warrant on July 27, 2012, and five seizure warrants on July 30, 2012.

affidavit.  All six (6) of the applications and their accompanying  affidavit in support thereof, were also signed by Magistrate Judge Jones of the Northern District of Florida.[20]  Prior to signing the search warrants, Magistrate Judge Jones reviewed the applications, attachments to the applications, and the supporting affidavit to determine whether probable cause existed to search the various locations described in Attachment "A," and to seize the items described in Attachment "B" of the affidavit. Clearly, Magistrate Judge Jones did not, "wholly abandon his judicial role" in his review of the search and seizure warrants, and the applications and affidavit in support thereof.  As such, the second prong of the *Leon* good-faith exception test is met.

"A magistrate's findings on the issue of probable cause are entitled to great deference.  This Court looks to see only whether a magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing."  *United States v. Daniel*, 982 F.2d 146, 151 (5th Cir. 1993) (internal citations and quotations omitted). In the instant case, Magistrate Judge Jones reviewed the applications and accompanying affidavit for the Gainesville warrants, found that there was probable cause to search and seize the described property, and authorized their execution.[21]

---

[20] The assertion by Defendant Reece that Magistrate Judge Jones signed only the six (6) search warrants and not the accompanying applications and affidavits is incorrect.  *See* Exhibits 1 - 6.

[21] "A magistrate's determination is entitled to great deference by reviewing courts."  *Illinois v. Gates*, 462 U.S. 213, 236 n. 10, 103 S.Ct. 2317, 2331 n. 10, 76 L.Ed.2d. 527 (1983).  "A magistrate need only have a substantial basis for concluding that a search would uncover evidence of wrongdoing."  *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960).

C.   The Gainesville warrants are not based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

"The hurdle for obtaining exclusion on this basis is a 'high one'." *United States v. Triplett*, 684 F.3d 500 (5th Cir. 2012) (quoting *Messerschmidt v. Millender,* — U.S. —, 132 S.Ct. 1235, 1245, 182 L.Ed.2d 47 (2012)).  "Officers are not ordinarily expected to question a magistrate's judgment as to probable cause.  This is so because magistrates are considered more qualified than law enforcement in making that assessment." *Id.* (citation omitted).  In *Payne*, the Fifth Circuit provided instruction on the manner in which Courts are to consider application of the good-faith exception as it relates to the inquiry into whether a reasonably well trained officer would know that the search was illegal despite the magistrate's authorization.

> In considering whether the good-faith exception applies, we do not attempt an "expedition into the minds of police officers" to determine their subjective belief regarding the validity of the warrant. *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. 3405 (internal quotations omitted). Rather, our inquiry is "confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* Whether the exception applies "will ordinarily depend on an examination of the affidavit by the reviewing court," *United States v. Gant,* 759 F.2d 484, 487–88 (5th Cir.1985), but "all of the circumstances [surrounding issuance of the warrant] may be considered." *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. 3405.

*Payne*, 341 F.3d at 400.

When the issue of whether the supporting affidavit so lacked probable cause that no reasonable officer could believe in its existence, determination of good-faith will typically depend on an examination of the affidavit by the reviewing court. *United States v. Gant*, 759 F.2d 484, 487-89 (5th Cir. 1985).  The Fifth Circuit has held that

two principles guide the Court's assessment of whether the supporting affidavit "bore indicia of probable cause: [f]irst, it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time; second, the affidavit should be construed in a common sense and realistic manner, with conclusions based upon the laminated total of available facts." *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988) (citations and internal quotations omitted).

The good-faith inquiry " 'is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Maggitt*, 778 F.2d 1029, 1035 (5th Cir. 1995) (quoting *Leon*, 104 S.Ct. at 3421 n.23).  In other words, "if it is plainly evident that a magistrate or judge had no business issuing a warrant, then police cannot objectively rely on the warrant."  *Id.* (quoted source and internal quotation marks omitted).  Moreover, the good-faith exception applicable here asks, "not whether the issuing judge made a proper determination of probable cause, but whether the agents reasonably relied on the judge's determination in light of the information set forth in the affidavit."  *United States v. Pigrim*, 922 F.2d 249, 252-53 (5th Cir. 1991). Officers may appropriately rely on the validity of a warrant when the "warrant application is supported by more than a 'bare bones affidavit' containing wholly conclusionary statements." *Id.* (citations omitted).

To determine whether an affidavit has sufficient indicia of probable cause to search, "[t]he affidavit must establish a nexus between the house to be searched and the evidence sought."  *United States v. Gallegos*, 239 Fed.Appx. 890, 895-96 (5th Cir. 2007) (quoting *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982).  "That nexus may be established . . . by direct observation or through normal inferences as to where the articles sought would be located."  *Id.*; *see also United States v. Pace*, 955 F.2d 270, 277 (5th Cir. 1992); *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996).

The Gainesville warrants signed by Judge Jones stated that he reviewed the application affidavit and concluded that there was probable cause to search the property and seize the items described in the warrants and attachments thereto.  On July 24, 2012, Special Agent Note, a HSI agent with over sixteen (16) years of law enforcement experience, signed and submitted the affidavit in support of the Gainesville warrants.  Special Agent Note averred that the affidavit was based upon his personal knowledge of and participation in this investigation, information furnished to him via discussions with other persons and law enforcement officers, sources of information, his review of bank records obtained via subpoenas and his training and experience as a Special Agent with HSI.

The affidavit established probable cause that violations of 18 U.S.C. §§ 542, 545 and 1956 and violations of 21 U.S.C. §§ 813, 846, 952 and 963, had been and/or were

continuing to be committed at the premises identified in the Gainesville warrants.[22] In this case, the facts set forth in the search warrant affidavit were not so insufficient to preclude a law enforcement officer's "objectively reasonable reliance" upon the judge's probable cause determination.  Accordingly, the "warrant based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable" exception to the good-faith exception rule does not apply, and this portion the suppression analysis in the good-faith context is pretermitted.  *See United States v. Nguyen*, 172 Fed.Appx. 558, 561 (5th Cir. 2006).

D.    <u>The warrant is not so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid</u>.

Defendant Reece argues that the good-faith exception to the exclusionary rule is inapplicable in the instant case because the Gainesville warrants are overly broad and fail the particularity requirement such that no reasonable officer would have believed that the warrant was valid.  The government posits that the Gainesville warrants are not overly broad and meet the particularity requirements of the Fourth Amendment.[23]  However, as the Court is well aware, under the good-faith analysis to the exclusionary rule the Court must first determine the fact of whether a reasonable

---

[22] A detailed analysis of the facts providing probable cause within the affidavit are contained in Section VII of this response, *infra*, and as such, will not be recounted in this section in an effort to limit the number of pages in the government's response.

[23] The particularity requirement of the Gainesville warrants will be discussed *infra* in Sections VII and VIII of this response.

officer could have relied on the validity of the warrant. If such a determination is made, and the other exceptions to the good-faith analysis are inapplicable, then the Court can find that the good-faith exception applies and the searches and seizures will be upheld without the need for a finding of probable cause. It is clear in the instant case that the agents involved in the search reasonably believed that the warrant was valid. As previously mentioned, the application, affidavit and attachments had been reviewed by several law enforcement officers as well as attorneys with the United States Attorney's Office for the Middle District of Florida prior to their submission to Magistrate Judge Jones. Magistrate Judge Jones then reviewed the documents and ultimately signed the Gainesville warrants and the supporting affidavit. Additionally, Special Agent Note, the affiant and agent in charge on the scene, made certain that those taking part in the search reviewed the warrant, affidavit and attachments and were familiar with what could be seized.[24]

Furthermore, during the execution of the search warrant at 6911 NW 22nd Street, Suite I, agents observed an additional suite, Suite J, in the northern most suite of the building. Suite J had a plain glass door with the letter "J" above it in white. Taped to the glass door was a white piece of paper with "Pozzolana Consulting Interviews."[25] When Special Agent Note and his team entered 6911 NW 22nd Street

---

[24] *See United States v. Allen*, 625 F.3d 830, 836 (5th Cir. 2010).

[25] As mentioned in Special Agent Note's affidavit, the investigation revealed that Pozzolana Consulting, LLC, was a business associated with Reece (Reece was the registered agent for Pozzolana Consulting, LLC). Funds from accounts associated with Mountain Industry, LLC, and Blue Sky International Brokers, LLC, were transferred into the Bank of America Pozzolana account, of which Reece was the sole signator.

to execute the warrant, they noted that James Llewellyn, a business partner of Defendant Reece, was located inside Suite J.  Defendant Reece informed Special Agent that his automobile keys and mobile telephone were also located in Suite J.  After consultation with an Assistant United States Attorney with the Middle District of Florida, a determination was made to secure Suite J, and return to Magistrate Judge Jones seeking an additional warrant authorizing the search of Suite J.[26]

Additionally, agents exercised restraint during the search by contacting the United States Attorney's office several times during the search whenever there was a question about what could be seized.  Officers reasonably relied on the validity of the warrant, and as such the fruits of the search are admissible under the good-faith exception.[27]

## VII.
## The Magistrate who Reviewed the Warrants had a Substantial Basis for Concluding that the Warrant was Supported by Probable Cause.

Assuming for the sake of argument that this Honorable Court were to hold that the good-faith exception does not apply, the Court should then proceed to a determination of whether the magistrate who signed the warrants had a substantial basis for concluding that probable cause existed. *United States v. Lampton*, 158 F.3d 251, 258 (5th Cir. 1998).  Probable cause to search exists if "there is a fair probability

---

[26] After a review of the application and affidavit, Magistrate Judge Jones authorized the search of Suite J, and the seizure of items identified in Attachment "B."

[27] ". . . evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may be properly charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" *Allen* 625 F.3d at 836 (quoting *Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 699-700, 172 L.Ed.2d 496 (2009)).

that contraband or evidence of a crime will be found in a particular place." *Gates* 462 U.S. at 238.  This determination is to be based upon the totality of the circumstances and grounded in practicality and common-sense.  *Id.*

"An affidavit supporting an application for a search warrant must, of course, provide the judicial officer with sufficient reliable information to determine probable cause.  In making this determination, however, the officer may draw reasonable inferences from the material he received, and his ultimate probable cause decision should be paid *great deference* by reviewing courts." *United States v. May*, 819 F.2d 531, 536 (5th Cir. 1987) (emphasis added) (citing *Gates* 462 U.S. at 236); *see also United States v. Settegast*, 755 F.2d 1117, 1121 (5th Cir. 1985).  In doubtful or marginal cases, resolution of whether probable cause exists "should be largely determine by the preference accorded to warrants." *Settegast*, 755 F.2d at 1121 (quoting *Gates*, 4262 U.S. at 237 n.10).

Regarding the Gainesville warrants, the probable cause set forth in the application for the warrants was based upon a ninety-eight page affidavit submitted by Special Agent Note.  The facts set forth in the warrant affidavit supplied ample basis for the magistrate's determination of probable cause, in fact; the affidavit provides sufficient information that Reece's corporations listed in the affidavit were permeated with fraud.

In the affidavit, Agent Note details his experience and length of service as a Special Agent for HSI.  Special Agent Note includes relevant training and experience

36

he has in the fields of controlled substance violations, customs/import violations, and financial investigations.[28]  In the overview to the affidavit, Agent Note explains the basis for the investigation, *i.e.*, an investigation into the importation of synthetic cannabinoids and cathinones based on false statements on shipping labels and invoices and smuggling goods (in violation of 18 U.S.C. §§ 542 and 545), conspiracy to import and distribute controlled substance analogues (in violation of 21 U.S.C. §§ 813, 846, 952 and 963), and money laundering (in violation of 18 U.S.C. §§ 1956 and 1957).

The affidavit provides the statutory authority Special Agent Note relies on to seek the seizure and forfeiture of property identified within the affidavit and attachment "B" (incorporated by reference).

The affidavit contains information regarding Special Agent Note's training and experience related to customs violations, and also contains information regarding HSI and CBP's responsibilities in monitoring and enforcing export/import laws.  Prior to providing the probable cause basis for the Gainesville warrants, the affidavit also contains an overview section on the Analogue Act (21 U.S.C. § 813) to include background information on AM-2201 and UR-144, and identifies the relevant individuals and businesses related to the importation of analogues.[29]

---

[28] *People v. Spears*, 228 Cal. App. 3d 1, 278 Cal. Rptr. 506 (6th Dist. 1991) (a law enforcement officer's training and experience may be considered).

[29] Defendant Reece argues that Special Agent Note's assertion that the fifteen corporations listed in the affidavit were, "businesses without a legitimate purpose," were made to knowingly or recklessly create a false impression to the magistrate.  *See* Rec. Doc. 321-2, p. 33.  However, Special Agent Note's statement is buttressed by facts within the affidavit to support probable cause, *i.e.* that Mountain Industry and Bleu Sky are used to import and distribute analogues, that Pure Sel sells organic products used to create the final products of smokeable synthetic cannabinoids (as well as to illegally conceal proceeds from the importation and sale of analogues), and that the remaining

"Of particular concern, is the rapidly-growing and widespread use of "Synthetic Cannabinoids," more specifically, 1-(5-fluoropentyl)-3-(1-napthoyl)indole (AM-2201), 1-Pentyl1-3-(2,2,3,3-tetramethycycloprooyl)indole (UR-144), and/or other similar chemical compounds used in the manufacturing of "Smokeable Synthetic Cannabinoids" which mimics the effects of delta-9-tetrahydrocannabinol (THC). Through discussions with CBP and DEA chemists and through training I have attended, I know that AM-2201, also known as Synthetic Marijuana, is an analogue of JWH-018, which mimics the effects of marijuana and became a Schedule I Controlled Substance effective March 1, 2011. According to CBP and DEA chemists and through information I have obtained from training I have attended, AM-2201 has a similar chemical structure to JWH-018 (additionally, on July 12, 2012, AM-2201 was listed as a Schedule I Controlled Substance).[30]

Search Warr. Aff., p.15.

The remaining eighty (80) pages of the affidavit detail specific facts that Special Agent Note reasonably believed provided a sufficient basis of probable cause for the magistrate considering the warrants and the attached affidavit. It included the fact that the Food and Drug Administration (FDA) was conducting an investigation into Defendant Reece regarding allegations of misbranding of chemicals. Agent Note references that FDA Special Agent Brannon had the occasion to interview Defendant Reece by telephone regarding the FDA violations (misbranding).[31]

The affidavit next informs the magistrate about several seizures of mislabeled packages containing white powdery substances, later determined to be either AM-2201

---

companies/corporations purposes were to assist in the illegal laundering of proceeds from Blue Sky and Mountain Industries.

[30] Expert opinion may be considered in an affidavit. *See United States v. Weber*, 923 F.2d 1338 (9th Cir. 1990).

[31] The details of SA Brannon's telephone interview with Defendant Reece are contained in pages 19-21 of the affidavit.

or UR-144 by laboratory examinations.   The first seizure mentioned occurred at Jacksonville, Florida on September 27, 2011.  Eight (8) packages, containing twenty-four (24) kilograms of a white powdery substance were seized pursuant to United States Customs border search authority. The shipping label stated that the packages were "decorative material samples, light stabilizer samples, photo luminescent material samples, desiccant material samples, and pigment enhancer material samples."  Search Warr. Aff., p.22.  The packages were addressed to either employees of Defendant Reece, or Reece himself.  Three packages were being sent to a UPS store in Gainesville, Florida.[32]  Two packages were addressed to Amanda Holt (another employee of Reece) at 2603 NW 13th St., PMB 301, Gainesville, Florida.   The remaining packages were addressed to "Alex Reece" at 5306 NW 67th St., Gainesville, Florida.[29]  On October 7, 2011, the CBP Laboratory in Savannah, Georgia revealed that the seized powdery substance was AM-2201.

Special Agent Note's affidavit includes information related to the seizure of thirteen (13) additional packages at mailing facilities in Gainesville and Jacksonville, Florida between October 18 and November 20, 2011.  The packages were shipped from China and contained an aggregate weight of thirty-seven (37) kilograms of powder.

---

[32] Della Waters, an employee of Defendant Reece, was the registered recipient of these three packages.  She was subsequently interviewed by Special Agent Note, and revealed that the packages were for her "boss," Alex Reece, and that Reece typically put employees names on packages so it would be easier for them to pick up the packages at the UPS store.  Waters also stated that she worked for Reece at 6921 NW 22nd St. Gainesville, FL.  She also stated that Amanda Holt was an employee of Reece.

[29] Special Agent Note later determined that this address was Reece's residence according to the Florida Driver's license database.

The packages were addressed to known addresses (from the course of the investigation) used by Defendant Reece.  All of these packages were sent to the CBP laboratory in Savannah, Georgia for chemical analysis.  The reports revealed that the powdery substance was AM-2201.[30]

The affidavit also details communications Special Agent Note had with Special Agent Posthumus regarding seizures of analogues in New Hampshire by HSI agents. That portion of the investigation revealed that Defendant Reece was using a Commercial Mail Receiving Agency (CMRA), wherein packages of analogues were mailed to Blue Sky Intl Brokers at the New Hampshire location.  The owner of the Parcel Room had contacted HSI because he became concerned that the shipping label on one of the packages claimed to be "shoesofcloth," when it actually contained an unknown white powder.  The rental information on the P.O. Box for the CMRA revealed that Amanda Holt (employee of Reece) had previously rented the box under the name "Blue Sky Intl Brokers," with a corresponding address of 6921 NW 22nd St. Gainesville, FL 32653.  Special Agent Posthumus informed Special Agent Note that he seized the package and discovered it contained two bags inside the package, each containing approximately one kilogram of an unknown powder.  Special Agent Posthumus informed Special Agent Note that between October 20 through October 27, 2011, six more packages containing a total of thirteen kilograms of powder came to the

---

[30] The affidavit also notes that none of the packages listed AM-2201 as the contents on the shipping label, and all of the packages were, in fact, mislabeled.

Blue Sky Intl Brokers P.O. Box.[31]  The laboratory results indicated that the powder from all of these packages was AM-2201.

The probable cause section of the affidavit also includes a portion detailing under cover telephone calls HSI Manchester, New Hampshire agents made to Amanda Holt (employee of Defendant Reece), and an unidentified male, "Mark Delponte."  *See* Search Warr. Aff. pp. 28-30.  This section reveals that Holt informed agents, who were posing as the owner and an employee of the CMRA, that they could expect a couple of packages a week from Blue Sky, that the substances were legal, and non-hazardous. The individual identified as "Mark," informed agents, in part, that Blue Sky was a broker for products from China, that Blue Sky only profited $40-50 a package and that sometimes shipments of the packages would get held up if brought through regular channels.  "Mark" agreed to pay $50.00, the same amount he claimed for profit of each package, to have the packages forwarded.

The next section details an interview Special Agent Note had with Chan Im, who had previously purchased AM-2201 from Defendant Reece.  *See* Search Warr. Aff., pp. 30-31.  Chan Im was a co-owner of S&C Discount Beverage located in Orange Park, Florida.  On December 8, 2011, Im was interviewed by Special Agent Note and revealed that he had received a little over one kilogram of AM-2201 from Blue Sky for approximately $8,000.00.  Im also revealed who he contacts, Amanda Holt, and that

---

[31] Three of the packages were addressed to "Blue Sky Intl Brokers," with shipping labels claiming that the contents were "pigment" and shipping invoices stating that the contents were "potassium formate."  Two of the packages were addressed to "Mr. Reece," and the shipping labels claimed the contents were "sample light stabilizer."  One of the packages was addressed to "James," and the shipping label claimed that the contents were "UV inhibitor."

41

he deposits money directly into Blue Sky's Bank of America account to pay for the product.

Pages 31-36 of the affidavit pertains to information revealed by a cooperating defendant (CD), who had previously purchased AM-2201 from Defendant Reece, as well as information received by an undercover officer (UC) relating to Blue Sky and Mountain Industry. On February 13, 2012, Special Agent Note interviewed the CD who stated that he/she had purchased AM-2201 from Mountain Industry and Blue Sky on eleven occasions over the period May through November 2011.[32] The CD informed Special Agent Note that he would contact Amanda Holt to purchase the AM-2201 and that she informed him to add 33 cents to the prices when he wired or deposited the money so that Mountain Industry/Blue Sky could tell who sent the money.[33]

On February 16, 2012, the CD placed a consensual, recorded telephone call to (352) 672-6295, the phone number the CD used when placing orders with Mountain Industry and Blue Sky. The CD spoke to Amanda Holt, and the CD began the conversation informing Ms. Holt that the CD had purchased AM-2201 from them a couple of months prior. When asked if they were still in business, Ms. Holt stated, "yes, under Blue Sky." The CD, and Holt discussed prices for kilogram quantities of AM-2201, and Ms. Holt also informed the CD that they also would be carrying UR-144.

_____

[32] Special Agent Note also indicated that this information was confirmed through a review of Mountain Industry and Blue Sky Bank of America records showing eleven purchases by the CD's company.

[33] Special Agent Note's affidavit explains that his review of Bank of America records for Mountain Industry and Blue Sky showed various cent amounts added to payments, for example $3,500.33, $15,00.15 and $5,500.12. Search Warr. Aff. p. 32.

Ms. Holt explained to the CD that UR-144 was more potent than AM-2201.  Ms. Holt explained to the CD that they would be at the Counterculture exposition in Las Vegas, but that the Blue Sky booth would be under the name Pure Sel.  *See* Search Warr. Aff., pp. 32-34.

The affidavit also revealed that during the trade show in Las Vegas on February 23, 2012, the UC and the CD met with Amanda Holt while she was working in the Pure Sel booth.  The meeting was recorded and monitored by Special Agent Note. During the meeting, Amanda Holt discusses the price per kilogram of AM-2201, and explained to the UC and CD that Mountain Industry was sold to an "Asian Company," because it got "too hot."  *See* Search Warr. Aff., p. 36.

Additional seizures of Cannabinoids are also discussed in the affidavit.  *See* Affidavit pp. 36-39.  On February 27, 2012, the affiant was contacted by HSI Special Agent Baclayon, HSI Reno, Nevada, regarding two packages addressed to Amanda H / Blue Sky International Brokers, 316 Cali Ave., #760, Reno, NV 89509.  SA Bacalyon informed the affiant that he had received the packages from CBP San Francisco International Mail Facility, where the packages were seized in an attempt to do a controlled delivery after it was determined that each package contained three kilograms of AM-2201, instead of sodium tripolyphosphate, which the shipping labels and invoices stated.  The above-mentioned address was a CMRA called the Postal Depot, and Special Agent Baclayon was able to determine that Amanda Holt had opened P.O. Box 760 under the name Blue Sky Intl Brokers, and that the packages delivered to the CMRA were being forwarded to 6921 NW 22nd St., Gainesville, FL

32653.  Special Agent Baclayon sent the two packages to the affiant (six kilograms of powder), and once received, the packages were forwarded to the CBP laboratory in Savannah, Georgia for analysis.  On March 13, 2012, the affiant received the lab report which stated that the powder contained AM-2201, a synthetic cannabinoid and an analogue of JWH-018, a Schedule I controlled substance, and that no sodium tripolyphosphate was detected.[34]

The affiant noted that on March 13, 2012, he was contacted by Special Agent Garvin, of HSI Las Vegas, regarding a package addressed to Puresel Alex R, 4224 W. Charleston Blvd., #236, Las Vegas, NV 89102.  This address was later identified as a CMRA named Mail 24/7.  The package was also received from CBP San Francisco International Mail Facility, in order to attempt a controlled delivery after a preliminary test indicated that the package contained two kilograms of AM-2201 instead of sodium tripolyphosphate, which was on the shipping label and invoice.  Special Agent Garvin sent the package to the affiant, and once received, it was sent to the CBP laboratory in Savannah, Georgia for further analysis.  On March 30, 2012, Special Agent Note received the laboratory report.[35]

The affiant also noted that he was contacted by CBP Officer Jane King of the San Francisco International Mail Facility regarding the seizure of seven packages; one

---

[34] As noted in the affidavit, mislabeling a commodity on packages is common when attempting to conceal illegal activity.

[35] The lab report stated, "The powder in each bag contains AM-2201.  AM-2201 is a synthetic cannabinoid and an analog of JWH-018.  JWH-018 is a Schedule I Controlled Substance (21 C.F.R. Section 1308.11).  The chemical compounds sodium tripolyphosphate and 2-phenyl-Benz[cd]indol-5(1H)-one were not detected in either sample powder."  *See* Search Warr. Aff., p. 38.

containing two kilograms and the other six packages each containing one kilogram of "synthetic cannabinoid powder" from China. The spectrometer tests indicated that the contents were UR-144. CBP Officer King informed the affiant that all of the packages shipping labels claimed that the contents were "Bromoindoline," and that the packages were being shipped to seven different addresses, six in Las Vegas, and one in Reno, Nevada. Officer King also provided the affiant with the recipients and addresses on the packages. The affiant noted that all of the recipients for the packages had previously been identified as employees or associates of Defendant Reece, and that the packages were to be forwarded to Reece's business address of 6921 NW 22nd St. Gainesville, FL 32653. All seven packages were then forwarded to the affiant, who sent them to the laboratory for further analysis. On May 2, 2012, the affiant received the laboratory reports which revealed a positive result for the presence of UR-144.[35] *See* Affidavit, pp. 38-39.

The affiant also noted that following the execution of a search warrant on DZE Corporation by the DEA Houston Field Division on April 18, 2012, he was contacted by DEA Special Agent Semrick. The affiant had previously identified DZE Corporation through bank records as purchasing synthetic Cannabinoids and cathinones from Mountain Industry and Blue Sky and then distributing the finished product. Special Agent Semrick informed the affiant that invoices and packing slips from Mountain

---

[35] The laboratory reports stated the following: "The sample contains UR-144; a synthetic cannabinoid and an analog of JWH-018, a Schedule I controlled substance (21 C.F.R. Section 1308.11). The presence of 5-Bromoindoline was not detected in the sample."

Industry to DZE Corporation were recovered during the search warrant.[36]  The affiant conducted a review of Mountain Industry's and Blue Sky's Bank of America accounts for the period January 1, 2011 through January 31, 2012, and determined that DZE Corporation had written seven checks to Mountain Industry totaling $598,002.33, and six checks to Blue Sky totaling $259,801.98.[37]

The affidavit includes additional indicia of probable cause in the database queries for formal entries section of the affidavit.  *See* Affidavit, p. 42.  A computer database query to determine if any formal entries for parcels imported by Reece into the United States, revealed that in 2011 and 2012 there were zero formal entries filed for any of the parcels imported into the United States, with the recipient listed as Alexander Reece, Mountain Industry, LLC, or Blue Sky International Brokers, LLC. However, the database revealed that seven formal entries were filed in 2010 for imports from China under Mountain Industry.  This inquiry gave the affiant a sufficient basis to determine that Defendant Reece had knowledge of customs entry laws, and was purposefully evading customs duties and inspections through the use of various CMRAs across the country in an attempt to insulate himself from civil and/or criminal liability.

_____

[36] The affidavit included the details from one invoice received, $109,999.89 worth of AM-2201.  The affidavit also revealed that a check to Mountain Industry from DZE Corporation in the amount of $110,000.33, memo line 20K 22, written on June 1, 2011 was deposited into the Mountain Industry Bank of America account on June 2, 2011.

[37] Through the affiant's training and experience, as well as the information provided during this investigation, the affidavit noted that the information listed on the memo section of the checks (10K2201, 20 k, and 20 k 22) revealed that the first number was used to describe the amount of kilograms being purchases, and that the "2201" and "22" referred to the synthetic cannabinoid AM-2201.  *See* Search Warr. Aff., p. 41.

The affidavit also provided information to the magistrate regarding seizures of XLR-11 from a CMRA identified with Defendant Reece in Anchorage, Alaska, a notification of seizure to Blue Sky for the shipment of a controlled substance and email correspondence between Reece and a Chinese supplier of synthetics from China on August 10, November 5, and November 7, 2010.

Based on Special Agent Note's training, experience, consultation with other law enforcement officers, his personal investigation into the criminal activity, and the information he received from other law enforcement officials related to the criminal activity, he established probable cause to believe that the safe deposit boxes for which he sought a warrant were being used to conceal assets from the illicit analogue operation he discussed in the affidavit.  His training and experience provided him the requisite knowledge that, "individuals involved in money laundering and importation and distribution of controlled substances and analogues often use safe deposit boxes to store proceeds from the sales of the controlled substances in the form of cash and also use the safe deposit boxes to store titles and deeds to real property that were purchased with the illicit proceeds from the sales of controlled substances."  Search Warr. Aff., p. 48.  As it related to this particular investigation, the affiant revealed that, there was probable cause to search the three safe deposit boxes because,

> This belief is based on the significant network of bank and corporation
> accounts discussed in this affidavit and that REECE frequently moves
> significant sums of money between these accounts and opens and closes
> accounts for the purpose of laundering money.  The use of multiple safety
> deposit boxes is consistent with REECES's methods of moving and hiding
> money and assets.  Safe deposit boxes are an even more discrete manner
> in which to hide (and launder) money and assets derived from an illicit

47

business, in this case the importation and distribution of analogue drugs."

*Id.*

Surveillance and database reviews established probable cause that the corporations listed previously in the affidavit were doing business at the two premises for which the Gainesville warrants were sought, and that evidence, fruits and instrumentalities of the crime being investigated would be located at said premises.

The Financial Activity section of the affidavit details with clarity, that the fifteen corporations listed within the affidavit were either; corporations used to import and distribute controlled substance analogues in the United States, or corporations whose purpose was to launder the proceeds of the criminally derived property of the corporations used to import and distribute controlled substance analogues. The affiant details the corporations, and the accounts associated with those corporations, that directly received the proceeds from the sales of the synthetic cannabinoids, Mountain Industry and Blue Sky (Phase 1 accounts); the accounts associated with corporations and individual accounts used to first attempt to layer the proceeds in an attempt to legitimize the illegal proceeds, Bank of America, C&M Investments, Inc., Bank of America, North Florida Management and Consulting, LLC, Bank of America, Pozzolana Consulting, Inc., Bank of America, Alex Reece, ITF, Bank of America, Pure Sel, LLC,  (Phase 2 accounts); the accounts associated with corporations to create an additional "layer" of separation from the Phase 1 accounts, Bank of America PC Holdings 1, LLC, Bank of America, PC Holdings 2, LLC, Bank of America, PC Holdings 3, LLC, Bank of America, PC Holdings 4, LLC, Bank of America, PC Holdings 5, LLC,

Bank of America, PC Holdings 6, LLC, Bank of America, ADR Holdings 700, LLC, Bank of America, Pozzolana Consulting, LLC (Legal Account), Bank of America, Madison's Avenue of Gainesville, Inc., Bank of America, C & M Investments of Florida, LLC (Phase 3 accounts); Financial Investment Accounts via E-Trade and BNY Mellon (Phase 3 Accounts); and real property purchased with illicit proceeds (Phase 4 accounts).

In determining whether probable cause existed for the search warrant, the task of the issuing magistrate is simply to make a practical, common-sense determination, whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular case. *Gates*, 462 U.S. 213.  Probable cause does not require evidence sufficient for a conviction. *United States v. White*, 766 F.2d 22 (1st Cir. 1985).  Probable cause does not require proof beyond a reasonable doubt. *United States v. Ventresca*, 380 U.S. 102, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965). And, probable cause does not require a preponderance of the evidence. *United States v. Harris*, 403 U.S. 573, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971).  Clearly, the affiant's in-depth factual basis provided in the affidavit provided the magistrate with an abundance of probable cause, and as such, even if the Court was to find that the good-faith exception was not applicable, there was still ample probable cause for the magistrate to authorize the Gainesville warrants.[38]

---

[38] Probable cause exists where "the facts and circumstances within their (the agents') knowledge, and of which they had reasonably trustworthy information . . . (are) sufficient in themselves to warrant a man of reasonable caution and belief that . . ." a crime has been or is being committed, and that seizable property can be found at the place or on the person to be searched. *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 132, 69 L.Ed. 543 (1925); *Brinegar v. United*

## VIII.
## <u>The Gainesville Warrants Satisfied the Particularity Requirement</u>.

". . . [T]he particularity requirement of the Fourth Amendment must be applied with a practical margin of flexibility, taking into account the nature of the items to be seized and the complexity of the case under investigation.  The Supreme Court has recognized that a complex criminal investigation may require piecing together '[l]ike a jigsaw puzzle' a number of items of evidence that may not appear incriminating when taken alone."  *United States v. Sawyer*, 799 F.2d 1494, 1508 (11th Cir. 1986) (quoting *Andreson v. Maryland*, 427 U.S. 463, 481, n. 10, 96 S.Ct. 2737, 2749, n. 10, 49 L.Ed.2d 627 (1976).  Whether a search warrant is sufficiently particular is determined on a case-by-case basis, and elaborate specificity is unnecessary because reasonable specificity is sufficient.[38]  *See United States v. Schoffner,* 826 F.2d 619 (7th Cir. 1987); *Russell v. Harms*, 397 F.3d 458 (7th Cir. 2005).  A factor to consider in determining whether a warrant is sufficiently particular includes the complexity of the case. *Sawyer*, 799 F.2d at 1508.  The particularity requirement for search warrants is a "standard of practical accuracy rather than a hypertechnical one."  *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011), *cert. denied*, — U.S. —, 132 S. Ct. 1713, 182

---

*States* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *United States v. Froman*, 335 F.3d 882 (5th Cir. 2004).  The word "probable" is less stringent than "more likely than not" or "by a preponderance."  "[T]he words 'reasonable cause' are perhaps closer to what is meant."  *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979).  " '[R]easonableness' is the overriding test of compliance with the Fourth Amendment. . . ." *Zurcher v. Stanford Daily*, 436 U.S. 547, 559, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

[38] "Reasonable specificity is required, not 'elaborate detail.'" *Triplett*, 684 F.3d at 504 (quoting *United States v. Hill*, 19 F.3d 984, 987 (5th Cir. 1994).

L.Ed.2d 254 (2012).

Defendant Reece does not argue that the premises sought to be searched were not described with particularity because clearly the warrant and incorporated attachments (listed as attachment "A") detail with particularity both; 1) the two locations and three premises (6921 NW 22nd St., and 6911 NW 22nd St. Suites I and J) sought to be searched, and 2) the location and numbers of the safe deposit boxes sought to be searched.  Rather, he argues that the items sought to be seized were not listed with, "sufficient particularity so that the executing officer is without discretion as to decide what may be seized."  Rec. Doc. 288-13, p.5.  However, a plain reading of the warrants and the attachment (Attachment "B") indicate that the warrants do indicate, with "reasonable specificity" what items can be seized during the execution of the Gainesville warrants.

Attachment "B" to the Gainesville premises warrants lists the following items authorized to be seized during the execution of the warrants (italics added).

## ATTACHMENT "B"

### Items to be seized

a.    Books, sales *records*, payroll *records*, bank *records* to include statements, checks, deposits, safety deposit *records*, wire transfers, invoices *records* related to suppliers and customers, shipping *records*, employee *records*, business correspondence, notes, *records* of meetings, publications on controlled substances, personal phone books, *records* showing conspirator's names, analogue formulas, dosage *records*, cash receipts and cash journals, notes, ledgers, and *records relating to the importation and distribution of analogues of schedule I substances, and schedule I substances*;

b.      Articles of personal property tending to establish the identity of person(s) in control of the premises, storage areas, or containers to be searched consisting of the following items: utility company receipts, rent receipts, telephone company bills, addressed envelopes, keys and personal photographs of conspirators limited to five;

c.      Any items or *documents* showing research of AM-2201, UR-144 or like substances (e.g. "Designer drugs," "Club drugs," etc.);

d.      Schedule I controlled substances, their analogues, organic materials used for the distribution analogues, equipment used in the manufacture of Spice and other Schedule I substances, packaging *materials*, labeling *materials* and marketing *materials* related to the manufacture and distribution.  Any items or *documents* showing the research of analogues;

e.      Any items or *documents* pertaining to foreign travel, including travel *documents*, passports, airline tickets, travel itineraries, receipts, and airport and airline stickers, including such travel to China;

f.      Cash in excess of $5,000.

In order to search for *data* that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth:

a.      Any digital device capable of being used to commit, further or store *evidence of the referenced offenses*;

b.      Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

c.      Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, multimedia cards (MMCs), memory sticks, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

d.      Any *documentation*, operating logs and reference manuals regarding the operation of the digital device or software used in the

digital device;

e.       Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

f.       Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.       Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

Since certain *documents* may be maintained electronically, this search warrant specifically authorizes the seizure and subsequent search of computers, hard drives, and any other device or equipment capable of storing data or text in any format, and any other storage media capable of containing data or text in magnetic, electronic, optical, digital, analog, or any other format.

With regard to the search and inspection of an electronic or computer device, and any related equipment or media for seizure of information or data *which is authorized to be seized,* the agents will analyze the electronically stored data, whether on-site or off-site in a laboratory or other controlled environment, by using techniques which serve to *keep the search within the authorization of this warrant*, such as:

a.       Surveying various file "directories" and the individual files they contain in order to locate evidence and instrumentalities authorized for seizure by the warrant;

b.       Opening or reading the first few pages of such files in order to determine their precise contents;

c.       Scanning the media for the recovery of any deleted or hidden files; and

d.       Performing electronic "keyword" searches through all electronic media to determine whether occurrences of language contained in such media exist that are intimately related to the subject matter of the investigation. (footnote 1.  In general, imaging is the take of a complete electronic picture of the device or media, including all hidden

sectors and deleted files, to obtain an exact copy of the device, drive, or media's stored data.)

This warrant specifically authorizes the creation and retention of a "mirror image" or "image" of electronic or computer devices, drives or media that are authorized to be seized for search, but not authorized to be permanently seized, if such be the case.

Any electronic or computer devices and related equipment or media that is *determined to have been used in furtherance of the illegal distribution and dispensing of controlled substances in furtherance of money laundering is an instrumentality of the crime, and thus, may be seized and retained pursuant to this warrant.*

Definitions: the term "*records*," "*documents*," and "*materials*," include all of the aforementioned items of evidence in whatever form and by whatever means such *records*, *documents*, or *materials*, or their drafts may have been created or stored, including, but not limited to, any handmade form (such as writing, drawing, painting with any implement on any surface); any photographic form (including microfilm, microfiche, prints, slides, negatives, photographs, videotapes and similar media, and photocopies) and any mechanical form (such as printing or typing), and electric, electronic, or magnetic form (such as tape recordings, cassettes, compact disks), or any information on an electronic or magnetic storage device (such as compact or optical disks, DVDs, thumb, flash, or hard drives, smart cards, printer buffers, or electronic notebooks, as well as computer printouts).

The assertions by the defendant that the attachment to the premises warrants lack particularity are without merit.  Attachment "B" describes, with reasonable particularity, that the executing agents are authorized to seize "*records* relating to the importation and distribution of analogues of schedule I substances, and schedule I substances."  Search Warr., Att. "B," p. 1.  Attachment "B" to the premises warrants also authorizes the seizure of "items or *documents* showing research of AM-2201, UR-144 or like substances. . ."  *Id.*  Additionally, Attachment "B" authorizes the seizure of

"any items or *documents* pertaining to foreign travel . . ."  *Id.*

As it relates to electronic data pertaining to records, documents and materials, Attachment "B" authorizes law enforcement to seize items that are capable of storing data and being read or interpreted by digital devices, including, "any digital device capable of being used to commit, further or store evidence of the *referenced offenses*." (italics added).[39]  Attachment "B" also provides the definitions of the terms "records," "documents," and "materials." "The term 'records,' 'documents,' and 'materials,' include all of the aforementioned items of evidence in whatever form and by whatever means such records, documents, or materials, or their drafts may have been created or stored, including, but not limited to . . . any information on an electronic or magnetic storage device . . ." *Id.* at p.3.

Attachment "B" provides for the seizure and search of electronic devices capable of maintaining documents related to the importation and distribution of analogues of schedule I substances or schedule I substances and provides techniques to be utilized by the investigative agents, "to keep the search within the authorization of this warrant." *Id.* at p.2.  Said techniques include 1) surveying various file directories and the individual files they contain in order to locate *evidence and instrumentalities authorized for seizure by the warrant*; 2) opening or reading the first few pages of such files in order to determine their precise contents; 3) scanning the media for the

---

[39] Clearly, the term referenced offenses as used in Attachment "B" refers to electronic data (*i.e.* records, documents and materials) that relate to the importation and distribution of analogues of schedule I substances and schedule I substances as mentioned in paragraph a. of the attachment.

recovery of any deleted or hidden files; and 4) performing electronic "keyword" searches through all electronic media to determine whether occurrences of language contained in such media exist that are *intimately related to the subject matter of the investigation.*

Attachment "B" is more than sufficient to survive any challenge related to particularity as it relates to this complex, multi-district investigation into a vast importation and distribution of analogues organization.  The defendant would have this Honorable Court look at particular sections of Attachment "B" in a vacuum, as opposed to in its totality, as was envisioned when it was drafted and authorized. Clearly, the electronic data for documents, records, and materials seized during the execution of the search warrant was subject to the same limitations as the "hard copy" records, documents and materials.  The defendant's hypertechnical parsing of the language within Attachment "B" creates an inaccurate appearance regarding the breadth of the warrant.  Additionally, the defendant's argument that searches and seizures of emails were not encompassed within the warrant is also without merit. Clearly, any emails contained within electronic data at the subject premises would be subject to seizure provided they are related to the "importation and distribution of analogues of schedule I substances and schedule I substances," as premised in the attachment to the warrant.  The affidavit provides law enforcement with adequate protocols while conducting their search to determine whether the electronic data (including email records) are within the bounds of the warrant, and therefore subject to seizure.  The premises warrants and the supporting Attachment "B" detail with sufficient particularity the items subject to seizure. "Reasonable specificity is required,

not 'elaborate detail.'" *Triplett*, 684 F.3d at 504 (quoting *United States v. Hill*, 19 F.3d 984, 987 (5th Cir. 1994).

## IX.
## Law Enforcement Properly Executed Seizures within the Scope of the Warrant.

Defendant Reece also contends that officers violated his rights by exceeding the scope of the warrant(s).  As previously mentioned, the Gainesville warrants issued in this case were not general warrants on their face, *i.e.* the things to be discovered were described with sufficient particularity.   In the instant case, as in *Kimbrough*, Defendant Reece has, "failed to meet his burden of proof in challenging the execution of the search warrants."   *United States v. Kimbrough*, 69 F.3d 723, 728 (5th Cir. 1995) A review of the "733 items of a personal nature seized from the residence," include valuable comic books, high end trading cards, a plethora of currency notes and coinage, and jewelry.  *See* Rec. Doc. 288-9.  A reasonable officer acting within the bounds of the warrant could clearly identify these items as proceeds of the illicit enterprise.  There is no argument that the government did not have the right to be on the premises in question, nor is there an argument regarding their lawful access to the vault containing said materials.  The officers acted in good-faith, seizing the plain view items that they had probable cause to believe were linked to criminal activity, *i.e.* importation and distribution of controlled substance analogues, customs violations and money laundering.[40]"

---

[40] "An officer executing a search warrant may seize: (I) items named in the warrants; and (ii) evidence that, although not described in the warrant, is subject to seizure under the plain view

## X.
## There is no requirement
## for a *Franks v. Delaware* hearing.

Defendant Reece cannot meet his burden that he is entitled to a *Franks* hearing. A defendant is entitled to a *Franks* hearing if he shows, "that (1) allegations in a supporting affidavit were deliberate falsehoods made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause." *United States v. Brown*, 298 F.3d 392, 395 (5th Cir. 2002).

The affidavit contained statements linking Defendant Reece and his corporations in a broad-based conspiracy to import controlled substance analogues into the United States through a pervasive system of mislabeling the products, in an attempt to avoid United States customs inspections and duties.  Additionally, the affidavit contains statements linking Defendant Reece and his corporations in a large scale conspiracy to distribute the controlled substance analogues.  Finally, the affidavit contained supporting information that multiple corporations utilized by Defendant Reece were subsequently utilized in an attempt to conceal the proceeds of his illicit enterprise, *i.e.* to launder the proceeds of the conspiracy to import and distribute controlled substance analogues.  These assertions were based on multiple seizures of controlled substance analogues, and a review of the financial records of the various corporations.  A thorough review of the allegations of "false" and "reckless" statements

---

doctrine.  The plain view doctrine applies if the officer has the legal right to be in the place from where he sees the object subject to seizure, a lawful right of access to the object itself, and if the object's incriminating nature is immediately apparent.  The incriminating nature of an object is immediately apparent if, under the circumstances, the officer has probable cause to believe that the item is linked to criminal activity."  *Russel v. Harms*, 397 F.3d 458, 465 (7th Cir. 2005).

or omissions has already been provided in Section VI., A, a-c, of this response.  It is clear from the government's response to these allegations, that Defendant Reece is not entitled to a *Franks* hearing, as he has not established that Agent Note provided any false statements or omissions within the affidavit, and even if he did so, that the false statements or omissions were made with a "reckless disregard for the truth" rather than as "the result of mere negligence and innocent mistakes," the first requirement for a *Franks* hearing.  *Franks*, 438 U.S. at 171; *Brown*, 298 F.3d at 395; *United States v. Dickey*, 102 F.3d 157, 161-62 (5th Cir. 1996).  Additionally, even if Defendant Reece could move past the first prong of the *Franks* test as to the assertions made in his motion, he would fail on the second prong - showing that the remaining portion of the affidavit is insufficient to support a finding of probable cause.  *Franks*, 438 U.S. at 171; *Brown*, 298 F.3d at 395.[41]

## XI.
## The All Records Exception.

Even assuming for purposes of argument that this Honorable Court was to hold that the Gainesville warrants failed to meet standard measures of particularity, said warrants are still valid because they fall within the all-records exception to the particularity requirement.  "Where probable cause exists to believe that an entire business was merely a scheme to defraud, or that all the records of a business are

---

[41] An additional discussion of each and every allegation of falsehoods or omissions is not recanted in this section of the response.  Assuming, *arguendo*, that the Court found Reece was able to cross the difficult hurdle of proving false statements or omissions as to one of the allegations, it is clear from the affidavit that the remaining information provided in the affidavit would still establish probable cause to conduct the searches.

likely to constitute evidence, a warrant authorizing the seizure of all such records and describing them in generic terms is sufficient to meet the particularity requirement of the fourth amendment." *Williams v. Kunze*, 806 F.2d at 598 (citing *United States v. Offices Known as 50 State Distrib. Co.,* 708 F.2d 1371, 1375 (9th Cir. 1983), *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981)).[42]

Should this Court take the unusual step that the warrants lacked particularity, it is of no doubt that the all-records exception applies in this case.  The affidavit provided Magistrate  Judge Jones with a substantial basis for concluding that there was probable cause to believe that criminal activity permeated Defendant Reece's corporations located at 6911 (Suites I and J) and 6921 NW 22nd Street in Gainesville, Florida.  The affidavit clearly established that Mountain Industry, LLC, and Blue Sky International Brokers,  LLC, were corporations deeply involved in the importation and subsequent distribution of controlled substance analogues, and that the other corporations described in the affidavit were being used to launder criminal proceeds, an important factor weighing in favor of finding that there was probable cause for a broad, all-records search.  A practical, common-sense assessment of the facts stated within the affidavit supports the conclusion that there was probable cause to believe that criminal activity permeated the premises searched during the execution of the Gainesville warrants.

---

[42] *See also United States v. Sawyer*, 799 F.2d 1494, 1508 (11th Cir. 1986) ("Moreover in cases involving a pervasive scheme to defraud, all the business records of the enterprise may properly be seized."); *United States v. Brien*, 617 F.2d 299, 308-09 (1st Cir. 1980) (approving warrant authorizing seizure of materials that made up "most of the business records" of investment firm).

## XII.
## <u>Conclusion.</u>

WHEREFORE, for all of the above-mentioned reasons, the government respectfully requests this Honorable Court to DENY the Motion to Suppress (Record Doc. 288), Motion to Suppress and Request for a Hearing Pursuant to *Franks v. Delaware* (Record Doc. 321), and the Motions to Adopt (Record Docs. 352, 363) without the need for an evidentiary hearing.

Respectfully submitted

STEPHANIE A. FINLEY
United States Attorney


/s/ J. Collin Sims
J. COLLIN SIMS, La. Bar No. 30727
Special Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Telephone: (337) 262-6618


/s/ John Luke Walker
JOHN LUKE WALKER, La. Bar No. 18077
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Telephone: (337) 262-6618

61

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 12-CR-00146 |
| | * | |
| VERSUS | * | JUDGE FOOTE |
| | * | |
| ALEXANDER DERRICK REESE (01) | * | MAGISTRATE JUDGE HANNA |
| DREW T. GREEN (02) | * | |
| THOMAS WILLIAM MALONE, JR. (03) | * | |
| BOYD ANTHONY BARROW (04) | * | |
| JOSHUA ESPINOZA (05) | * | |
| CURIOUS GOODS L.L.C. (06) | * | |
| RICHARD JOSEPH BUSWELL (07) | * | |
| DANIEL JAMES STANFORD (08) | * | |
| DANIEL PAUL FRANCIS (09) | * | |
| BARRY L. DOMINGUE (10) | * | |

CERTIFICATE

I hereby certify that on May 6, 2013, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the court's electronic filing system.

s/J.  Collin Sims
J.  COLLIN SIMS
Assistant United States Attorney

62