UNITED STATED DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 12-CR-00146 (01) |
| VERSUS | JUDGE FOOTE |
| ALEXANDER DERRICK REECE - 01 | MAGISTRATE JUDGE HANNA |
| DREW T. GREEN - 02 | |
| THOMAS WILLIAM MALONE, JR. - 03 | |
| BOYD ANTHONY BARROW - 04 | |
| JOSHUA ESPINOZA - 05 | |
| CURIOUS GOODS LLC - 06 | |
| RICHARD JOSEPH BUSWELL - 07 | |
| DANIEL JAMES STANFORD - 08 | |
| DANIEL PAUL FRANCIS - 09 | |
| BARRY L. DOMINGUE - 10 | |

DEFENDANT REECE'S REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT REECE'S MOTION TO SUPPRESS EVIDENCE AND
MOTION TO SUPPRESS EVIDENCE AND REQUEST
FOR A HEARING PURSUANT TO *FRANKS V. DELAWARE*

COMES NOW, the Defendant, Alexander D. Reece, by and through undersigned counsel, and submits this Reply Memorandum in Support of his Motion to Suppress Evidence (Doc. 288), Motion to Suppress Evidence and Request for a Hearing Pursuant to *Franks v. Delaware* (Doc. 321), and in response to the Government's Consolidated Response (Doc. 492) In Opposition to Defendant Reece's Motion to Suppress Evidence (Doc. 288), Defendant Reece's Motion to Suppress Evidence and Request for a Hearing Pursuant to *Franks v. Delaware* (Doc. 321), Motion to Adopt of Other Defendant (Doc. 352), and Motion to Adopt Motion of Other Defendant (Doc. 363).[1]

I. **INTRODUCTION**

---

[1] Pursuant to the Court's remarks during the April 26, 2013 motion hearing, undersigned counsel has made every effort to limit the length of this Reply, which is a consolidated Reply to the government's consolidated Response to both of Defendant Reece's Motions to Suppress.

1

In its consolidated Response (Doc. 492), the government argues that "law enforcement acted in good faith at all times in obtaining and executing the search warrants," that the warrants were supported by sufficient probable cause, and that the Defendant has not established a reasonable expectation of privacy in the business premises. (Doc. 492, P. 3.) For the reasons stated herein, and for those previously stated in Defendant's Motions to Suppress (Doc. 288, 321), it is clear that Mr. Reece has standing to challenge the searches and seizures at issue; that any argument by the government that probable cause existed to support the searches is undermined by the material omissions and misrepresentations made by the Affiant knowing that they were false or reckless; and that the Affiant's failure to particularize the items to be seized pursuant to the search warrants and the excessive, overbroad nature of the searches and seizures independently compel suppression. The *Franks* hearing should be conducted and this Court should rule based upon findings made after such hearing.


## II. <u>ARGUMENT</u>

### A. STANDING

The government's position that Mr. Reece lacks standing to challenge the searches of his offices is simply without merit.[2] As discussed at length in both of the Defendant's Motions to Suppress, Mr. Reece clearly has standing to challenge the searches of his businesses. (*See* Doc. 288, P. 3-5; Doc. 321, P. 8-10). In its Response, the government correctly notes that standing to challenge a search depends on whether the challenger held a "legitimate expectation of privacy" in the area or areas to be searched, (Doc. 492, P. 4 (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980)); however, it incorrectly applies the relevant facts and law in reaching its erroneous

---

[2] The government concedes that the Defendant has standing to challenge the search and seizure of the contents of the three safe deposit boxes. (Doc. 492, P. 5.)

conclusion that Mr. Reece did not have an expectation of privacy in his own professional offices.

It has long been the rule that a person has standing to challenge a search of his office, regardless of how many people with whom he shares the office. *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968). Mr. Reece built, owned, and personally occupied the business offices located at 6911 NW 22nd Street in Gainesville, Florida. He was the lessee and occupant of the business offices located next door at 6921 NW 22nd Street in Gainesville. These offices constitute the principal places of business for several businesses owned and operated by Mr. Reece. Furthermore, and as will be demonstrated at a hearing, Mr. Reece maintained sleeping quarters at 6921 NW 22nd Street, where he slept from time to time, as well as a closet full of clothes, a refrigerator, and cooking facilities. It is also undisputed that the government seized thousands of Mr. Reece's personal emails as well as other emails authored by him and sent to numerous people relating to far more subjects than described in the affidavit. The government does not acknowledge these facts.

Moreover, it is an undisputed fact that Mr. Reece was actually on premises, at work, at the time agents executed the search warrant at 6911 NW 22nd Street. The Defendant is consistently at these offices conducting business, transacting business, and preparing documents and emails. His reasonable expectation of privacy in the area is corroborated by the volumes of personal items seized from his offices, including items seized from locked safes. Additionally, at the Defendant's direction, all computers on premises were password protected, and only individuals approved by Mr. Reece were granted access to the electronic files and network. This is not a case where Mr. Reece claims standing simply based on his status as a corporate officer.

To support its argument that the Defendant lacks standing, the government relies primarily on *United States v. Judd*, 687 F.Supp. 1052 (N.D. Miss. 1988). In *Judd*, the court

considered the defendants' challenge of a search of a bookkeeping office and related seizure of corporate records. Unlike in our case, however, in *Judd,* the government seized no personal items from the defendants, but only corporate bookkeeping and accounting records, which were maintained in a common file room. *Judd*, 687 F. Supp. at 1055. Moreover, the defendants in *Judd* had no involvement in the preparation of the seized records, and the search was directed toward corporate activity generally, as opposed to one individual person. *Id.* at 1056. There is no indication there were sleeping quarters on those premises, that passwords were installed by Mr. Judd to insure limited access to information, or that like Mr. Reece, personal correspondence (*e.g.,* emails) were seized.  Plainly too, these searches were directed primarily against Mr. Reece.

The facts in *Judd* are wholly distinguishable. As to defendant Puett, who alleged standing in *Judd,* the Court found:

> Puett was not present when the search occurred and failed to sufficiently demonstrate that these documents were in fact prepared by Puett, that Puett used the bookkeeping area as a personal office, that Puett's personal belongings were disturbed by FBI agents, that Puett was personally aggrieved in a significant way, or that this search was directed at Puett as an individual.

*Id.* at 1057.

As to defendant Judd, the district court opinion contains few facts, other than he was on the premises at the time of the search, was sole shareholder of Kilgore Mining, and maintained a personal office at the property, although none of the records in dispute were seized from that office. All records were apparently seized from a small bookkeeping office which the court found that neither Mr. Judd nor Mr. Puett worked out of. *Id.* at 1055.[3]

The facts of *United States v. Britt*, 508 F.2d 1052 (5th Cir. 1975), also cited by the government, are similarly unhelpful to the government's position. The court denied standing to

---

[3] Despite its findings, the district court found the issue of Mr. Judd's standing a "close question" and proceeded to hear and rule upon the substantive issues raised in the motion to suppress. The court also recognized that each case "must be decided on its own facts." 687 F.Supp. at 1056.

Britt, finding:

> although Britt was president of Fitts, he was not its sole shareholder, the documents seized were normal corporate documents not personally prepared by him, and the area searched at 1819 Peachtree Road was described as a "storage area." 508 F.2d at 1055. Furthermore, there is no evidence that Britt spent any time working in the storage area-or in any space at 1819 Peachtree for that matter-or that any of the material seized was taken from his personal desk, briefcase or files.

*Britt*, 508 F.2d at 1055.

The Reece business offices searched by the government were premises from which the Defendant conducted regular day-to-day business activities, prepared documents and emails, lived from time to time, and stored and maintained scores of personal items; including his children's birth certificates, his wife's jewelry, family passports, and gifts he personally had received from family members as a child. He also made sure that the computer networks were password protected and accessible only by people he chose to have access.

Further, the business records seized went beyond mere corporate and account records and included a vast number of documents in email and hard copy that were personally prepared by Mr. Reece. Many documents were seized from the computer primarily utilized by Mr. Reece, as well from his personal office. Perhaps most significantly, unlike the government's action in *Judd*, the Affidavit and search warrants executed at the Mr. Reece's businesses came as a result of government activity directed at Mr. Reece as an individual; this is plainly demonstrated by the overwhelming focus of the Affidavit on Mr. Reece. In fact, Mr. Reece's name is contained on almost every page of the Affidavit, and no less than 180 times throughout the document. Indeed, the last 47 pages of the Affidavit are directed toward Mr. Reece's financial activity. Mr. Reece's privacy interest in both the premises searched and the items seized provide him standing to contest the validity of the search warrants in this case.

**B.  THE EXCLUSIONARY RULE APPLIES, AND THE GOOD FAITH EXCEPTION DOES NOT**

The government contends that "the exclusionary rule is inapplicable to *all materials* seized under the Gainesville warrants because the good-faith exception to the exclusionary rule applies." (Doc. 492, P. 11.) For the reasons set out at length in Defendant's Motion to Suppress Evidence and Request for Hearing Pursuant to *Franks v. Delaware* (Doc. 321), the undersigned respectfully disagree and submit that the law is clear that the good faith exception to the exclusionary rule is wholly inapplicable given the false statements and omissions made by the Affiant in the search warrant Affidavit.[4]

**1.  The Issuance of the Warrant and Length of the Affidavit are Irrelevant in Light of the Affiant's Material Misrepresentations and Omissions**

The government's Response seems to state, in a variety of ways, that the mere fact that the warrants were issued after a review by the issuing judges proves that the good faith exception applies. (Doc. 492, P. 12-14.) Such reliance is misplaced, especially in light of the concerns raised by the undersigned pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). In addition, the fact that the Affidavit is 98 pages long is no indicator that the 98 pages provide sufficient probable cause. The length of the document does not ensure that the Affidavit included all relevant and material information that should have been included to aid the reviewing magistrate (thus the material omissions), nor did it guarantee that no false or misleading statements would be included. Most of the Affidavit has little to do with the premises searched.

Moreover, the fact that the "affidavit and attachments were thoroughly reviewed by an additional agent of Homeland Security Investigations, Task Force Agents of the North Florida

---

[4] At the time of the filing of the Defendant's Motions to Suppress (Docs. 288, 321), the undersigned was unaware of the existence of the search warrant Affidavit submitted to, and signed by, Judge Jones on July 24, 2012 because it had not been provided in discovery and apparently had not been made available to the AUSAs in the Western District of Louisiana.

HIDTA, and several Assistant United States Attorneys for the Middle District of Florida, prior to their submission to the magistrate judge" supports the Defendant's position that the misstatements and omissions made by the Affiant were intentional. (*Id.* at P. 13, 34.) As the investigating individual, Affiant was charged with accurately and fully reporting the fruits of his investigation to the reviewing AUSAs; how were they to know he had omitted certain material facts or was misleading them as to others?[5]

### 2.  The Seizure Was Unreasonable and Excessive

The government also asserts that the officers "acted reasonably in executing the Gainesville warrants, and nothing about this case or the warrants categorizes it as 'unusual.'" (*Id.* at P. 14.) The undersigned respectfully disagrees. The seizures here included more than 730 items of a personal nature. Although the warrant strictly limited the personal items subject to seizure, agents disregarded that limitation and seized virtually *all* personal items on the premises, including report cards and birth certificates for Mr. Reece's two children, pictures of Mr. Reece and his family, watches, jewelry, lady's hand bags, titles to vehicles and jet skis, a comic book collection, coin collection, and personal jewelry. (*See* Doc. 288, P. 21-29; Doc. 288, Ex. 9 (complete list of personal items seized outside the scope of the warrant)). As recognized by the government, this excessive seizure of personal items occurred despite the fact that agents claim to have contacted the U.S. Attorney's Office "several times during the search whenever there was a question about what could be seized," and "Special Agent Note, the affiant and agent in charge on the scene, made certain that those taking part in the search reviewed the warrant, affidavit and

---

[5] The government cites the incorrect standard for granting a hearing in this case. The applicable standard is that established by the Supreme Court in *Franks*. The Defendant has met this standard and the Court should persist in its ruling to hold an evidentiary hearing on this matter.

attachments and were familiar with what could be seized[6]." (Doc. 492, P. 34-35.) The unreasonable, excessive and overbroad nature of the search and seizure mandates suppression of the evidence.

### 3.   The Plain View Doctrine Does Not Apply

In its Response, the government contends that the searching agents clearly identified the personal items seized[7] as "proceeds of the illicit enterprise." (Doc. 492, P. 57.)  It does not allege these items were named in the warrants, but instead, and incorrectly, relies on the plain view doctrine to justify their seizure. (Doc. 492, P. 57-8). The government's statement is further incorrect as demonstrated by the fact that many of the personal items seized had accompanying receipts showing their date of purchase.[8]  For instance, each comic book was accompanied by a receipt of sale in its package, showing the date of purchase some of which go back two decades or more. Regarding the coin collection seized, Mr. Reece began collecting these in his childhood. All of them were seized. Nearly all of the bank notes seized were accompanied by their receipt showing the date they were purchased as well. A quick review of the receipts that accompanied the items seized clearly indicates that these items were purchased before any alleged criminal activity, some dating back to Mr. Reece's childhood. How could they then be claimed to have been proceeds of a business that per the indictment began in March, 2011?

---

[6] Given the excessive nature of the search, it will be important to know what those conversations were about. One would expect, if the agents were to contact the reviewing AUSAs at the time of the search, it would be regarding the permissible scope of the search.  Apparently, that never happened, or the seizing agents chose to ignore whatever advice they received. Whether and the extent of contact between the agents and the AUSAs, and what, if any, steps were taken to familiarize the searching agents with the limitations of the warrant are topics to be developed in the *Franks* hearing.

[7] The government identified comic books, trading cards, currency notes, coins, and jewelry as comprising the personal items seized. (Doc. 492, P. 57.) However, the searching agents also seized birth certificates of Mr. Reece's children, report cards, and family photographs.

[8] This was also indicated in a letter dated August 15, 2012, sent by attorney Brian Albritton to Assistant United States Attorney Tysen Duva in the Middle District of Florida, regarding the return of these personal items which clearly fell outside the scope of the warrants. A copy of this letter has been attached hereto as Exhibit 1.

As a result, this case is not like *United States v. Kimbrough*, 69 F.3d 723 (5th Cir. 1995), where the searching agents seized some irrelevant items while leaving a significant number of personal items behind after proper inspection. Rather, the searching agents here took *every* personal item on the premises. This wholesale type of seizure is exactly what the Constitution forbids and provides insight into the deliberate and reckless misbehavior of the searching agents.

It cannot be said the searching agents were acting within the permissible scope of the warrants or in good faith or that items were properly seized pursuant to the plain view doctrine.

## C. THE AFFIANT'S MATERIAL MISREPRESENTATIONS AND OMISSIONS REQUIRE A *FRANKS* HEARING AND SUPPRESSION

### 1. Misrepresentations and Omissions Regarding Pharmacology

Suppression is appropriate in this case as the judges who issued warrants were misled by information in the Affidavit "that the affiant knew was false or would have known was false except for his reckless disregard for the truth." *United States v. Leon*, 468 U.S. 897, 923 (1984) (citing *Franks*). In its Response, the government briefly addresses the omissions and false or reckless statements by the Affiant; however, the government's pleading fails to address the pervasive nature of these misrepresentations and omissions in the Affidavit. (Doc. 492, P. 21.)

As an initial matter, and as noted on page nineteen of the Defendant's Motion to Suppress and Request for a *Franks* Hearing (Doc. 321), the Affiant consistently misrepresents as fact that AM-2201 and UR-144 were established controlled substances analogues at the time the Affidavit was signed. This is simply not true. In fact, AM-2201 or UR-144 were not even recognized as a Drug or Chemical of Concern on the DEA's website as of June 23, 2012, just a few weeks prior to the execution of the search warrants in this case,[9] or on October 16, 2012, over three months

---

[9] Ex. 2, DEA, Chemicals of Concern, June 23, 2012, http://web.archive.org/web/20120623000924/http://www.deadiversion.usdoj.gov/drugs_concern/index.html.

*after* the execution of the search warrants.[10] Indeed, last Thursday, May 16, 2013-mere days before the filing of this Reply-the DEA for the first time, temporarily banned UR-144, along with two other chemicals (XLR11 and AKB48), pursuant to the Attorney General's temporary scheduling authority.[11] Consistent with this, defense counsel has found ***no public notice*** which was available to the Defendant during the relevant time period that states that either AM-2201 or UR-144 were analogues of JWH-018. The Affiant's unequivocal representation that these were controlled substances must be measured as of the date of the Affidavit, and plainly, he misrepresented these facts to the reviewing judges.

As to the required pharmacological testing that must be conducted to establish a substance as an analogue, the government concedes that "the affiant failed to include information regarding human testing/effects on humans regarding the relevant synthetic cannabinoids," and failed to acknowledge chemical properties of UR-144. (Doc. 492, P. 21.) Notwithstanding this admission, the government contends that these material omissions do not mean the Affiant's unequivocal statements concerning AM-2201 being a controlled substance analogue of JWH-018 are false or reckless. This response misses the mark. As stated in the Defendant's Motion to Suppress, the Affiant "*completely omitted the fact that **no** human testing has been conducted*." (Doc. 321, P. 20) (emphasis added)). The crucial point here is not merely that the Affiant "failed to include this information"; rather, and much more significantly, it is that this testing had not been conducted at all at the time the Affidavit was signed, and after purportedly checking with experts and DEA and HIS, the Affiant chose what science to include in his Affidavit, and more importantly for our purposes here, what to omit. At the time the Affidavit was executed, the

---

[10] Ex. 3, DEA, Chemicals of Concern, Oct. 16, 2012, http://web.archive.org/web/20121016234824/http://www.deadiversion.usdoj.gov/drugs_concern/.
[11] *See* Ex. 4, Schedules of Controlled Substances: Temporary Placement of Three Synthetic Cannabinoids Into Schedule I, 78 Fed. Reg. 28,735 (May 16, 2013). On April 12, 2013, a Notice of Intent to temporarily schedule these three synthetic cannabinoids was published in the Federal Register (78 Fed. Reg. 21,858).

government could only speculate as to the effect of UR-144 and AM-2201 on the human central nervous system compared to JWH-018 and this was undoubtedly known to any DEA expert the Affiant claims to have consulted. The significance of these omissions is clear considering that the pharmacological effects of these alleged controlled substance analogues are necessary elements of the violation being investigated and critical to a finding of probable cause. That the Affiant's material misrepresentations and omissions were done recklessly or deliberately is further evidenced by his attempts to convince the issuing judge to issue the warrant based on comparisons of the alleged analogues to THC, and his decision to omit that there is *no* data, testing, or scientific literature regarding the pharmalogical effects of AM-2201 and UR-144 on humans in comparison to JWH-018.

### 2.   Misrepresentations and Omissions Regarding Mislabeling

In the Affidavit, Special Agent Note makes reference to the mislabeling of products being imported. (*See* Aff. at P. 21-22, ¶ 30, P. 34-35, ¶ 36.) The Affiant makes a false statement about the cost of AM-2201 and UR-144 for the purpose of creating the false impression that shipments received by Mountain Industry LLC and Blue Sky International Brokers LLC exceeded the value of $2,000 and required formal entry by U.S. Customs. (*See* Doc. Doc. 321, P. 30-32.) In addition, Special Agent Note deliberately created the false impression that under U.S. Customs law, the Defendant, as opposed to the Chinese vendors, was responsible for the labeling and shipping of these items for passage through U.S. Customs. (*See* Doc. Doc. 321, P. 32-33.)

As an initial matter, the government references reports by FDA Inspector William Brannon, Special Agent Note, and U.S. Postal Inspector Keith Hannon regarding recordings and interviews of the Defendant, as well as of Amanda Holt and Della Waters, employees of Mr. Reece's companies. (Doc. 492, P. 38-41.) The interviews and recordings of these individuals are

11

also referenced in the Affidavit. (Aff. at P. 21-27, 36-39.) Despite the reference to this information, it is important to note that undersigned counsel has not received any of these recordings, notes, or reports of any interviews of Mr. Reece, Ms. Holt, or Ms. Waters. Although the defense has requested any and all recordings, reports, and notes concerning the interactions between federal agents and Mr. Reece or his employees, none have been provided as of this writing.[12]

In its Response, the government does not squarely address the Affiant's misrepresentations regarding the dollar figure used to value merchandise in determining whether shipments are subject to Formal Entry requirements. (Doc. 492, P. 24.) Rather, the government attempts to justify the Affiant's false statements by incorrectly stating that any price value placed on the packaging of the alleged "mislabeled items" bought by Mr. Reece, and shipped by the Chinese suppliers through EMS, would be "irrelevant in determining what price was the actual paid price." (Doc. 492, P. 24.)

Defendant's Motion to Suppress, and especially the accompanying affidavit by former U.S. Customs attorney Peter Quinter, make clear that the *purchase price* of the merchandise from the Chinese seller is the value used to determine whether a Formal Entry must be made for U.S. Customs. (*See* Doc.321, P. 31 (quoting and citing to Aff. of Attorney Peter Quinter).) Despite this being the correct measure of value to be considered in determining whether a Formal Entry must be made, Special Agent Note omitted any mention of this number, and instead, falsely represented that the purported *retail* value of these items is the measure in deciding whether Formal Entry is required. (Aff. at P. 12.)

---

[12] Pursuant to the Court's Order, the government is to turn over, by May 30, 2013, transcripts of any interviews conducted of Mr. Reece by federal authorities or local law enforcement officials, or any combination thereof. (Doc. 477). To date, none have been received. Lacking a record of what we are entitled to under Federal Rule of Criminal Procedure 16, we cannot make a full factual Reply to the government's Response.

Moreover, the Affiant omitted the fact that the price of AM-2201 or UR-144 was substantially less than the $2,000 threshold.  Documents filed by the government in this case and available to the Affiant at the time of the execution of the search warrant prove that chemicals imported by Mountain Industry and Blue Sky were determined by U.S. Customs to have a domestic value substantially below the $2,000 per kilo value, contrary to representations in the Affidavit. As exhibit C to its Response to Reece's Motion to Dismiss Counts I and III of the Superceding Indictment (Doc. 441), the government attached correspondence from U.S. Customs to individuals employed by the Mountain Industry and Blue Sky. *See generally* Ex. 5, Letters Dated June 13, 2011 and June 10, 2011 from U.S. Customs and Border Protection.

The first letter, dated June 13, 2011 and addressed to Della Waters, notes the seizure of 3,204.590 grams of an unidentified chemical with an appraised domestic value of $3,300.00, which equates to approximately $1,030 per kilogram. The second letter, dated June 10, 2011 and addressed to Jim Llewellyn, notes the seizure of 5,100 grams of JWH-122 and that U.S. Customs valued this shipment at $3,200.00, or roughly $620 per kilogram. Based on these documents, which were available to the Affiant at the time he drafted the Affidavit but nevertheless completely omitted, it is clear that U.S. Customs' own domestic evaluation of at least two seized chemicals was far less than $2,000 threshold referenced by the Affiant. Regardless of the absence and misrepresentation of this information, the fact remains that the wholesale *purchase price*, as opposed to the price paid by a subsequent buyer, or the retail price paid by the end user, controls in determining value for Formal Entry purposes, and this information was misrepresented in the Affidavit. (*See* Doc.321, P. 31 (quoting and citing to Aff. of Attorney Peter Quinter).)

13

Moreover, the government includes as exhibit 11 to its Response, spreadsheets seized pursuant to the search warrants executed at the Defendant's businesses, which purportedly show details of orders placed by "Reece's corporations." (Doc. 492, P. 25-26.) There is no indication, however, that this information was available to the government, or reviewed by the Affiant, prior to his drafting the Affidavit, nor was this information provided as an attachment to the Affidavit for judicial review. It is unclear why these documents, which were acquired after the fact, were submitted to support the earlier Affidavit. They should be disregarded.

In the Affidavit and Response, the Affiant and government seek to impute criminal intent on the part of Mr. Reece for the utilization of EMS, a Chinese-based express carrier similar to FedEx, and what the government terms a "Commercial Mail Receiving Agency" (CMRA). (*See* Doc. 492, P. 26.) The use of CMRAs or express mail companies like EMS or FedEx is not in and of itself evidence of any wrongdoing. It is a very common practice for commercial businesses to utilize these services in wholesale purchasing and resale, especially where shipments are numerous and involve overseas vendors and multiple final destinations. The government's contention that the mere use of CMRAs or express carriers is an indicator of criminal activity is erroneous and illogical. If the government's position was correct, every shipment and all parties associated with those shipments would be arrested upon the package entering the U.S. of course, that does not happen. The government's argument fails.

Moreover, beyond the assertion that the Defendant's arguments regarding the use of EMS are "preposterous," the government fails to address the fact that the Chinese vendors, as sellers of the wholesale chemicals, were responsible for shipping the product, including compliance with any and all Customs duties and regulations. (*See* Doc. 492, P. 26.) As wholesale purchasers of chemicals from overseas suppliers, Mountain Industry and Blue Sky were the buyers, and

14

recipients,[13] of these products.[14] A simple investigation into the relationship between the Defendant, Mountain Industry, Blue Sky, and the Chinese suppliers and looking at the Custom law, would have quickly revealed to the Affiant and federal authorities that shipping and Customs declarations were, in fact, the responsibility of the Chinese sellers/shippers. Where importations involve express carriers, the responsibility for identifying the contents of the products being imported lies with the carrier, not with the recipient. Further, the Affiant knew the express carriers were used for importation of these products because he personally saw and seized the packages when they arrived in the United States at the Jacksonville mail facility. (*See* Aff. at P. 21-22, ¶ 30.)

The Affiant and government also fail to address the multitude of products shipped to Defendant's companies by Chinese suppliers/shippers through EMS, which were inspected by U.S. Customs, or held for a certain time period to be inspected, and then released to the Reece companies. This information is absent despite the government's admission that it conducted a "computer database query for parcels imported into the United States" that were related Mr. Reece or the subject companies, (Doc. 492, P. 46), information which defense counsel has requested from the government on multiple instances and which the Court has ordered the government to turn over by May 30, 2013. (Doc. 477). No full reply can be made to this until the government turns over this information that was available to Affiant at the time of his Affidavit,

---

[13] The database query referenced by the government to determine formal entries for parcels shipped to Mr. Reece, Mountain Industry, or Blue Sky simply shows that the Defendant received international shipments through his position with Mountain Industry and Blue Sky. (Doc. 492, P. 46.) The information obtained through the query does not evince who was responsible for the shipping, labeling, or Customs declarations, nor does it provide any insight into the contractual relationship and legal obligations between buyer, Mountain Industry and Blue Sky, and the Chinese vendors, who were the sellers/shippers.

[14] The government does not allege, nor is there any evidence to support, that companies aside from Mountain Industry or Blue Sky, such as PureSel and Pozzolana Consulting, purchased AM-2201 from Chinese wholesale chemical suppliers.

and which the Defendant is entitled to under Order of Judge Hanna and Federal Rule of Criminal Procedure 16.

### 3.   Misrepresentations and Omissions Regarding Defendant's Other Businesses

As to the issue of Mr. Reece's fifteen companies, the government merely states that the role of these companies was "sufficiently addressed in the affidavit." (Doc. 492, P. 28.) This is not the case, and the Response fails to articulate *how* the role of these companies is "sufficiently addressed." As discussed in the Defendant's Motion to Suppress and Request for *Franks* Hearing, information concerning these companies was easily obtainable by Special Agent Note, or anyone else, through simple searches on Google, Pacer, or the electronic dockets of local state courthouses. (Doc. 321, P. 33-37.) The government's Response does not address this readily-available information that proves the legitimacy of these companies and their activities. This public information evinces that these entities are independent of Mountain Industry and Blue Sky, and legitimate in their own right. In fact, the government's Response reinforces the legitimacy of one of Mr. Reece's other companies, Pozzolana Consulting, by noting that the company was advertising for interviews on the door of the company's office at the time agents executed search warrants at the business premises. (Doc. 492, P. 34.)

These companies all served a legitimate purpose, and Special Agent Note deliberately created the misimpression that Mr. Reece was operating only illegitimate businesses at his offices to receive illicit analogues up until the day of the search. This is simply not true. Furthermore, the mere movement of money by the Defendant-the owner or partner in the subject companies-is not enough to establish probable cause for money laundering and a business enterprise "permeated" by criminal conduct (Doc. 492, P. 34-36).

As a result of the Affiant's misstatements, the reviewing judges were left with a very different picture than one which depicts the truth. It is clear from the Affidavit that the Affiant omitted and misrepresented pertinent information in an attempt to show that the Defendant was solely responsible for making all decisions and declarations for imported chemicals purchased from, and shipped by, Chinese sellers and but for the Affiant's false and reckless materials misrepresentations and omissions, there would not be probable cause to justify the signing of the subject warrants.

### D.  Particularity

The government's contention that the warrants were sufficiently particular by providing "reasonable specificity" is likewise incorrect. In its Response, the government initially points to the use of generic descriptive terms and general reference to criminal activity in arguing the scope of the warrant is properly limited.[15] (Doc. 492, P. 54-5.) However, as pointed out in the Defendant's Motion to Suppress Evidence, general descriptors and references to criminal activity have repeatedly been interpreted as authorizing impermissible general searches. (*See* Doc. 288, P. 9); *Voss v. Bergsgard*, 774 F.2d 402 (10th Cir. 1985) (warrant authorizing seizure of documents and records that are "evidence of violations of Title 18, United States Code, Section 371" [the federal conspiracy statute] found overbroad); *United States v. Leary*, 846 F.2d 592 (10th Cir. 1988) (recognizing that "a series of decisions from other circuits have held that reference to a broad federal statute is not a sufficient limitation on a search warrant"). *See also United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986) ("effort to limit discretion [in a warrant] solely by reference to criminal statutes was inadequate"). Generally, these cases establish that

---

[15] The government has alleged that the warrants are reasonably limited by the phrases "records *relating* to the importation and distribution of analogues of schedule I substances, and schedule I substances," "items or documents showing research of AM-2201, UR-144 or like substances …," and "any items or documents pertaining to foreign travel." (Doc. 492, P. 54-5.)

merely incorporating a federal statute in a warrant is not enough to meet the constitutional requirement of particularity.

The warrants here are far more problematic than the warrants in the above cited cases. The affidavit here authorized the seizure of "records relating to the importation and distribution of analogues of schedule I substances, and schedule I substances." (Doc. 492, P. 54.) This does not reference a single federal statute, but instead refers to a *series* of federal statutes that cover a very wide variety of activity and subject matter. This reference significantly broadened the amount of items subject to seizure beyond the scope of the investigation, amounting to no limitation at all.

The further authority to seize "items or documents showing research of AM-2201, UR-144 or *like substances*…" also impermissibly broadens the scope of the warrants to the extent that there is no procedure or explanation provided for how the searching agents are to determine what a "like substance" may be. The searching agents are left to their own discretion in deciding which items can be seized; thus allowing-and in essence encouraging-an impermissible general search regarding any substance located on the premises, regardless of its nature, legality, or relationship to the investigation.

These are the only two indications in the warrants and their attachments of the criminal activity being investigated for which items are authorized to be seized. These provide little guidance to searching agents and the government's argument that these terms served as a limitation to the warrants is without merit.

The definitions provided in Attachment "B"–for the terms "records," "documents," and "materials"–reinforce the impermissibly broad authority given the searching agents. That portion of Attachment "B" provides:

18

Definitions: the term "records," "documents," and "materials," include all of the aforementioned items of evidence in whatever form and by whatever means such records, documents, or materials, or their drafts may have been created or stored, including, but not limited to, any handmade form (such as writing, drawing, painting with any implement on any surface); any photographic form (including microfilm, microfiche, prints, slides, negatives, photographs, videotapes and similar media, and photocopies) and any mechanical form (such as printing or typing), and electric, electronic, or magnetic form (such as tape recordings, cassettes, compact disks), or any information on an electronic or magnetic storage device (such as compact or optical disks, DVDs, thumb, flash, or hard drives, smart cards, printer buffers, or electronic notebooks, as well as computer printouts).

There is no discernible distinction between the term "records," "documents," or "materials." The examples and explanations provided in parentheses throughout this paragraph make clear that this definition does not limit the scope of authorized seizures; rather, they broaden the searching agents' authority for what is to be included. It is difficult, if not impossible, to imagine any item present in an office that would be excluded by this definition. The government's argument that these definitions limit the scope of the warrants is just wrong.

The government's suggestion that Attachment "B" provides the techniques to be utilized by agents in their search of electronic devices is also incorrect. On this point, the government's Response fails to address the Affidavit's inclusion of the phrase "*such as*," which immediately precedes the listed searching options. As set out in the Defendant Reece's Motion to Suppress Evidence, (*see* Doc. 288, P. 8), use of the phrase "such as" permits the searching agent to elect to use the listed techniques or not. Instead of addressing the Defendant's argument regarding this phrase, the government ignores it. Further, despite giving options to use search terms or keywords, Attachment "B" did not provide, or even recommend, any actual terms or keywords to be used during the search. By its own language, this section allowed the searching agents full discretion to employ a strategy of their choosing.

The government further contends that Attachment "B" limits the seizure of the electronic data for documents, records, and materials seized to the same limitations as the "hard copy" records, documents, and materials. (Doc. 492, P. 56.) However, its analysis is wrong, and completely ignores *United States v. Otero*, 563 F.3d 1127, 1131 (10th Cir. 2009), *cited approvingly in United States v. Allen*, 625 F.3d 830 (5th Cir. 2010). Attachment "B" to the warrants provides a clear separation between "hard copy" and electronic items subject to seizure when it states:

> In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize *the following items, subject to the procedures set forth... .*

Immediately following this paragraph is a list of electronic items, starting with the letter "a" to signify the beginning of a new section.

In *Otero*, discussed at length in the Defendant's Motion to Suppress Evidence, (Doc. 288, P. 14-15), the court examined a very similar warrant that separated between "Items to be Seized" and "Computer Items to be Seized." *Otero*, 563 F.3d at 1130. The court found that while each paragraph of the first section contained limiting language, the second section regarding "Computer Items to be Seized" did not. *Id*. It went on to find that the warrant therefore authorized an unlawful general computer search, concluding that the computer searches were not subject to the same limitations as the "hard copy" searches. *Id*. at 1133. The reasoning of *Otero* supports the undersigned's reading of Attachment "B" in this regard.

In its Response, the government ignores *Otero*, instead accusing the Defendant of a "hypertechnical parsing of the language within Attachment 'B.'" (Doc. 492, P. 56.) To the contrary, Mr. Reece's position is not only supported by the document, but legal authority as well. Accordingly, the section of Attachment "B" authorizing the seizure of electronic items contains

no limitations as required to satisfy the particularity requirement. Any electronic items seized must be suppressed as a result.

The government further contends that all e-mails were subject to seizure as the attachment to the warrants allowed seizure of documents "provided they are related to the importation and distribution of analogues of schedule I substances and schedule I substances." (Doc. 492, P. 56.)  However, this argument does not at all account for what actually occurred. If the warrants were intended to include emails subject to that limitation, it should have, and simply could have, stated that intention. Instead, the searching agents seized every email from every computer located on the premises, regardless of its subject matter. This wholesale seizure occurred because there was no guidance or protocols given regarding the search and seizure of e-mails in the Affidavit, warrants, or their attachments. There is simply no mention in any of these search warrant documents regarding the use of emails, how they may relate to the alleged criminal activity, or giving authority to seize emails. By failing to include any reference to emails in the laundry list of items to be seized, it is clear they were not encompassed in the warrants, and must be suppressed as a result.

As also discussed in Defendant Reece's Motion to Suppress Evidence, (Doc. 288, P. 16-8), computers have unique characteristics that require a different approach in view of the particularity requirement. *See United States v. Carey*, 172 F.3d 1268, 1275, n. 7 (10th Cir. 1999) ("the storage capacity of computers requires a special approach" when assessing the particularity requirement). *See also Otero*, 563 F.3d at 1132 (a computer's ability to intermingle private information "makes the particularity requirement that much more important"); *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005) ("warrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of materials").

21

Defendant Reece's Motion to Suppress Evidence, (Doc. 288, P. 16-8), cited *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1179-80 (9th Cir. 2010) ("CDT") and *United States v. Tamura*, 694 F.2d 591, 597-98 (9th Cir. 1982), which applied procedural safeguards to protect "the privacy of materials that are intermingled with seizable materials, and to avoid turning a limited search for particular information into a general search of office file systems and computer databases." *CDT*, 621 F.3d at 1170. In the instant case, there were no procedures or protocols provided in the Affidavit, warrants, or their attachments to protect private or privileged materials. This allowed for what amounted to an impermissible general search of Mr. Reece's personal emails, electronic files, and computer databases.

The failure to properly limit the discretion of the executing agents by providing a warrant meeting the particularity requirement was unreasonable under the circumstances of this case, requiring the evidence seized be suppressed.

**E.  The All Records Exception is Inapplicable**

In the event the Court determines the warrants lacks sufficient particularity, the government requests that the Court find them legally sufficient regardless of this defect based on what it terms the "all-records exception." (Doc. 492, Doc. 59.) The Fifth Circuit has held that the particularity requirement of the Fourth Amendment may be satisfied "[w]here probable cause exists to believe that an entire business was merely a scheme to defraud, or that all the records of a business are likely to constitute evidence." *Williams v. Kunze,* 806 F.2d 594, 598 (5th Cir.1986). To support this premise, the government cites *Kunze* and *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981).

The facts in *Kunze* and *Jacob* are readily distinguishable from those here. Both cases concern search warrants of business offices stemming from investigations of fraudulent activity,

as opposed to the alleged distribution of controlled substances or controlled substance analogues. In *Jacob*, the government conducted a search and seizure of the defendant's offices, an attorney implicated in a scheme to submit fraudulent claims to insurance companies for the purpose of inflating settlements. *Jacob*, 657 F.2d at 50. Similarly, the search and seizure in *Kunze* originated with an investigation into the fraudulent conduct involving criminal allegations of tax fraud that occurred domestically and overseas. *Kunze*, 806 F.2d at 596. While some companies focused primarily on domestic matters, and others on overseas transactions, the purpose and business activities of the various companies were related to each other, consistent with one another, and interdependent. The investigation uncovered, and allegations alleged, that the companies all shared a common purpose, goals, and clients. *Id.* at 596-98. In addition, the vast majority of items seized in *Kunze* were client files, unlike the multitude of personal emails, documents, and non-documentary items of a personal nature seized by authorities in Mr. Reece's case.

The *Kunze* court observed that, in order for a general warrant authorizing the seizure of all business records to meet the particularity requirement of the Fourth Amendment, there must be probable cause to believe that an individual's "entire business was merely a scheme to defraud." *Id.* at 598. However, the Affidavit in this case, unlike that in *Kunze*, wholly fails to establish this predicate. Stripped of its false statements and with material omissions added back in, there is no support for the government's contention that the Affidavit shows "criminal activity permeated the premises," or that the Defendant's "other corporations...were being used to launder criminal proceeds." (Doc. 492, P. 60.)

As discussed and as will be proved at hearing, Mr. Reece's companies on these premises were legitimate companies with purposes and activities distinct from those of Mountain Industry and Blue Sky. Any suggestion to the contrary is a material false statement.

The government has introduced no evidence (and indeed there is none) that any companies operating out of the Defendants' office complex, aside from Mountain Industry and Blue Sky, ever purchased AM-2201 from overseas vendors. Moreover, and as discussed more in depth in section II(B)(2), *supra*, information widely available to Special Agent Note and federal authorities prove that these other companies had distinct business operations. Publically available information evinces the legitimacy of the other the other businesses; including 10VOX Entertainment LLC and Toyopia, Inc., toy businesses owned and operated by Mr. Reece. Other businesses located on premises dealt in the area of real estate and consulting, including Madison's Avenue of Gainesville; C & M Investments, LLC; Market Street LLC; Pozzolana Consulting LLC; JLAR Holdings, LLC; and North Florida Management and Consulting LLC. General Internet searches and searches of Florida court records reveal that each of these companies are involved in distinct business activities, and each have separate missions, clients, business leaders and associates.

Finally, the Affidavit provides insufficient evidence to support that Mr. Reece's financial transactions were done with the intent to promote or carry on unlawful activity, and for the purpose of concealing or disguising the unlawful activity, as required to prove money laundering under 18 U.S.C. § 1956(a). Mere movement of funds is insufficient to establish probable cause to believe a money laundering event has occurred, and it does not provide an adequate basis for the Affiant's assertion that every single one of the businesses searched by federal authorities was part and parcel of a business enterprise "permeated" by criminal conduct.

### III.  CONCLUSION

Mr. Reece plainly has standing to challenge the searches and seizures of his business premises, in which he held a legitimate expectation of privacy. Moreover, any argument by the government that probable cause existed to support the search is untenable in light of the material omissions and misrepresentations made by the Affiant knowing that they were false or reckless; and the Affiant's failure to particularize the items to be seized pursuant to the search warrants. Further, the excessive, overbroad nature of the searches and seizures actually conducted also compel suppression. For these reasons, and for the reasons set forth in the Defendant's Motion to Suppress Evidence (Doc. 288) and Motion to Suppress Evidence Pursuant to *Franks v. Delaware* (Doc. 321), the Defendant respectfully requests that this Court persist with its hearing on this matter and rule based upon facts determined therein.

Dated: May 20, 2013

Respectfully submitted,

__/s/ Todd Foster_____      __/s/ Michael D. Skinner_____

TODD FOSTER                         MICHAEL D. SKINNER #12118
(Admitted Pro Hac Vice)            SKINNER LAW FIRM, L.L.C.
Florida Bar No.: 0325198           600 Jefferson Street, Suite 810
tfoster@tfosterlaw.com             P. O. Box 53146
CHRISTINA KIMBALL WALKER    Lafayette, LA 70505
(Admitted Pro Hac Vice)            337-354-3030 Telephone
Florida Bar No.: 0085093          337-354-3032 Facsimile
ckimball@tfosterlaw.com         mike@law.glacoxmail.com
**TODD FOSTER LAW GROUP**      *Attorney for Alexander D. Reece*
1881 W. Kennedy Blvd.
Tampa, FL 33606
Telephone: (813) 229-7373
Facsimile:  (813) 280-9981
*Attorneys for Alexander D. Reece*

25

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this 20th day of May, 2013 a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Assistant United States Attorneys J. Collin Sims and John Luke Walker by operation of the Court's electronic filing system.

_\_\_/s/ Todd Foster_____

TODD FOSTER
(Admitted Pro Hac Vice)
Florida Bar No.: 0325198
tfoster@tfosterlaw.com
**TODD FOSTER LAW GROUP**
1881 W. Kennedy Blvd.
Tampa, FL 33606
Telephone: (813) 229-7373
Facsimile:  (813) 280-9981
*Attorneys for Alexander D. Reece*